# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-61238-CIV-COHN-SELTZER

IN RE MAKO SURGICAL CORPORATION
DERIVATIVE LITIGATION

---

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF <u>CORPORATE ASSETS, AND UNJUST ENRICHMENT</u>

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION .............................................................1

II.     JURISDICTION AND VENUE ........................................................6

III.    THE PARTIES.................................................................................6

        A.      Plaintiff ...............................................................................6

        B.      Nominal Defendant.............................................................7

        C.      Individual Defendants .........................................................7

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS ......................13

        A.      Fiduciary Duties................................................................13

        B.      Additional Duties of the Audit Committee Defendants.........14

        C.      Code of Business Conduct and Ethics ...............................15

        D.      Control, Access, and Authority..........................................15

        E.      Reasonable and Prudent Supervision.................................16

        F.      Breaches of Duties .............................................................17

V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION...............17

VI.     FACTUAL BACKGROUND .........................................................18

        A.      MAKO's RIO System and MAKOplasty Products Represent the Company's Core Business and Were Closely Monitored by the Individual Defendants ..........................................................................19

VII.    THE INDIVIDUAL DEFENDANTS WERE WELL AWARE OF THE MULTIPLE CHALLENGES UNDERMINING RIO SYSTEMS SALES IN 2012.........23

VIII.   THE INDIVIDUAL DEFENDANTS DISSEMINATE AND/OR CAUSE MAKO TO DISSEMINATE MISLEADING STATEMENTS REGARDING RIO SYSTEM SALES...............................................................................27

        A.      The Individual Defendants Issue Misleading 2012 Guidance ...............................28

        B.      As the Company Struggles to Meet Its 2012 Guidance, the Individual Defendants Continue to Conceal the True Facts Underlying MAKO's Dismal RIO System Sales ..................................................36

IX.     THE FULL EXTENT OF THE INDIVIDUAL DEFENDANTS' MISLEADING
        GUIDANCE IS REVEALED ............................................................................46

X.      DAMAGES TO MAKO ..................................................................................53

XI.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .......................................54

        A.      Demand Is Excused as to CEO/Inside Director Ferré Because He Is Not
                Disinterested and Independent and Because He Faces a Substantial
                Likelihood of Liability.............................................................................55

        B.      Demand Is Futile as to Audit Committee Defendants Dewey, Pettingill,
                and Pruitt (Together with Ferré, a Majority of the Board) Because They
                Face a Substantial Likelihood of Liability..............................................56

        C.      Demand Is Futile as to the Entire Board Because All Eight Defendant
                Directors Face a Substantial Likelihood of Liability..............................58

        D.      Additional Reasons Why Demand Is Futile.............................................59

COUNT I .................................................................................................................59

COUNT II ................................................................................................................61

COUNT III...............................................................................................................61

PRAYER FOR RELIEF .............................................................................................62

JURY DEMAND.......................................................................................................63

Plaintiff Todd Deehl ("Plaintiff"), by his attorneys, submits this Verified Consolidated Shareholder Derivative Complaint against the defendants named herein.

## I.   NATURE OF THE ACTION

1.      This is a verified consolidated shareholder derivative action brought by Plaintiff on behalf of nominal defendant MAKO Surgical Corp. ("MAKO" or the "Company") against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment.  These wrongs have exposed the Company to hundreds of millions of dollars in potential legal liability and resulted in significant damages to MAKO's reputation, goodwill, and standing in the business community.

2.      Founded in November 2004, and taken public in February 2008, MAKO is a medical device company that introduced the first robotic-arm assisted technology for orthopedic surgical procedures in the United States. MAKO's products include the RIO® Robotic Arm Interactive Orthopedic ("RIO") system, which assists the surgeon during surgical procedures, and a number of proprietary disposable implants used for joint restoration.  The Company's core product, the RIO system, is used for orthopedic knee resurfacing and total hip replacement procedures the Company calls MAKOplasty.®   RIO systems are expensive — the Company reports an average selling price of $850,000 for each RIO system.

3.      MAKO's fortunes turn entirely on the Company's ability to persuade hospitals and other institutions to make the substantial investments required to purchase, implement and train physicians to use the RIO system.  Sales of RIO systems and implants used for MAKOplasty procedures comprise over 92% of MAKO's revenue, with sales of RIO systems alone accounting for approximately 51% of the Company's revenue.

4.      Each deal was personally scrutinized by defendant Maurice R. Ferré ("Ferré") and reviewed by the rest of the Individual Defendants, as losing even one projected RIO system sale would materially impact the Company's financial performance and ability to achieve its business outlook.  The progress of pending deals, and any information that could possibly impact sales of RIO systems, was, of necessity, the Individual Defendants' daily primary concern.  Sales of the Company's RIO systems and MAKOplasty platform, therefore, received the Individual Defendants' full and undivided attention throughout the relevant time period.

5.      Given the vital importance of these products to MAKO's financial success, the Company's directors, officers, and other employees carefully scrutinized and closely monitored

each RIO system sale and the information about the key factors influencing RIO system and implant sales, including hospital and health care providers' evaluations of the RIO system's ROI ("return on investment"), price resistance and physician adoption rates.

6.      Beginning in early 2012, MAKO began experiencing slower sales and a "longer selling cycle [to close deals]" with its prospective customers, which consisted primarily of medical and academic institutions.  The Individual Defendants (as defined herein) learned that there were two primary reasons for the declining sales and longer selling cycle.

7.      First, MAKO's RIO system and related disposable implants had advanced to the third of the five stages in the technology "adoption lifecycle," at which point the amount of time, effort and resources required to convince new users to adopt the RIO system became much greater, and sales success rates much lower, than in the earlier stages.

8.      The adoption lifecycle of new medical technologies is generally understood to break down into five segments: (i) innovators (the first to adopt an innovation); (ii) early adopters; (iii) early majority; (iv) late majority; and (v) laggards. The "innovators" and "early adopters" are the initial subset of the targeted demographic adopting the technology. They are typically opinion leaders with elevated standing or notoriety in the relevant medical field, such that they are highly influential in the decisions of other physicians. The next phase, the "early majority," includes the first sizable population segment in the adoption lifecycle to adopt the technology. The late majority and laggards are the very last to adopt the technology.  The late majority is a sizable segment of the population that will adopt a new product only after a majority of the population already has.  The laggards consist of a small subgroup of skeptics that are the most conservative and resistant to new technology.

9.      By early 2012, MAKO's RIO system and disposable implants had moved from the "early adopters" phase of the technology adoption lifecycle to the "early majority" phase.  This drastically altered the challenge of selling RIO systems, rendering projections based on earlier period sales unreliable.  As opposed to the innovators and early adopters, who are leaders in the field and represent the specific targeted demographic, the early majority typically require evidence from the innovators and early adopters showing that the technology has been used successfully before adopting the technology themselves.  As the Individual Defendants later admitted, sales to this next transaction of customers would necessarily involve longer "selling cycles and less certainly that prospective sales would actually close."

10.    <u>Second</u>, beginning by at least early 2012, MAKO was facing pricing pressures from its prospective customers.  Prospective customers were largely unconvinced that the expensive RIO system would be used by physicians who were not among the "early adopters" and would, therefore, not offer the requisite return on investment at the prices MAKO was charging.  Hospitals were requiring additional layers of approval and increased surgeon support before they were willing to commit to the product – facts the Individual Defendants withheld from shareholders despite the mounting evidence of increasing resistance.

11.    The Individual Defendants were well aware of the longer selling cycles and the increasing skepticism expressed by MAKO's prospective customers. The Individual Defendants also knew or consciously disregarded that the Company's strategy for driving further adoption of the RIO system was flawed because initial sales had been made to smaller hospitals eager to demonstrate their "high tech" credentials, rather than the real opinion lenders on the medical professional at leading medical institutions.

12.    Adoption of a new medical technology is typically driven using a top-down approach, whereby manufacturers first seek to utilize key opinion leaders (KOLs) or respected minds in the field to investigate and sponsor the value of their product.  MAKO, however, used a bottoms-up approach, choosing initially to market the RIO system and MAKOplasty for its knee procedures to local community-based hospitals and smaller hospitals eager to establish their "high tech" credentials with recruits by making the new technology available.  This unorthodox strategy — which excluded virtually all of the larger and more influential medical institutions with deeper pockets and KOLs — imposed significant hurdles to the Company's efforts to grow adoption of its products beyond the early adopters.  The Individual Defendants knew that MAKO did not have enough sales, marketing, or personnel to accelerate the shift from manual complete knee procedures to the specialized implant customization MAKOplasty procedures offered on their own.  As such, 2012 sales promised to be far more challenging than 2011 sales.

13.    The Individual Defendants also knew that this could not expect significant sales growth from MAKO's newly launched hip application. The Individual Defendants knew that its small 3-person sales team was receiving negative feedback from early users of its hip MAKOplasty platform. This negative feedback seriously undermined the perceived value of the RIO system and MAKOplasty procedures for hip procedures and made it more difficult to convince potential buyers of the return on investment at the RIO system's high price.  In

particular, surgeons using MAKO products to conduct hip procedures complained about the lack of quality implants, obstruction of the robotic arm when using the RIO system, and the extensive procedure time and steep learning curve to conduct these procedures.  Exacerbating these challenges to MAKO's hip platforms was a lack of data showing any clinical benefits from using MAKO products for hip procedures.  As such, the perceived costs far outweighed the benefits of MAKO's hip platform in the eyes of many potential customers.

14.     Finally, the Individual Defendants knew that the RIO system utilization rates that they touted and used to justify MAKO's projections were drastically inflated.  A small concentration of high-volume surgeons using the RIO systems was primarily responsible for the impressive utilization rate figures that the Individual Defendants trumpeted.  These figures were not representative of utilization rates across RIO's system installed base and created the misleading impression that usage of the RIO systems was up across the board.  Many installed RIO systems were hardly being utilized at all.

15.     Despite knowing or consciously disregarding these facts, the Individual Defendants caused or permitted the Company to issue unreasonably aggressive and unfounded projections throughout the first half of 2012.  MAKO's projections for its RIO system sales in 2012 called for a 16% to 29% growth in sales from 2011 levels.  These sales projections were unsupported by — and, in fact, directly contradicted by — the material information available to the Individual Defendants.  None of the evidence available to the Company reasonably supported the conclusion that it would achieve the same sales it did in 2011, much less trump 2011 sales by 29%.  On the contrary, the internal information available to the Individual Defendants signaled that the Company would experience slowing sales and face substantial difficulties in trying to match its 2011 sales in 2012.  Nevertheless, defendants Ferré and Fritz L. LaPorte ("LaPorte"), the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively, confirmed and reaffirmed on several occasions the Company's 2012 guidance for RIO system sales.

16.     The truth began to emerge on May 7, 2012, when MAKO issued a press release announcing its first quarter 2012 financial results.  Revenue for the first quarter of 2012 dropped approximately 40% from the fourth quarter 2011 and missed analysts' consensus expectations by approximately 20%.  In addition, procedure volume also missed expectations by approximately 5%, and the Company's ever-important utilization rates dropped as well.  The Company missed

analyst expectations for sales of the RIO system by approximately 33%, selling only six of its RIO systems in the first quarter, and missed the average analyst target of nine placements.

17.     The Individual Defendants attempted to downplay the miss, blaming the dismal sales results on issues that arose in a few prospective sales, such as an academic institution that purportedly needed "additional paperwork … to be done" before closing the deal, and two hospitals that sought reductions in price that the Company refused.  The Individual Defendants' spin was that the miss was caused by a perfect storm of unfortunate unforeseeable events, and that the Company did not expect such bad luck to repeat itself.  The Individual Defendants withheld the material issues rooted in the changing landscape of the Company's targeted customer base that would continue to jeopardize all pending and future sales.

18.     While the Individual Defendants vaguely hinted at the pricing pressures faced by the Company, they continued to conceal the full extent of the problems encumbering RIO sales. Defendant Ferré maintained that the deals that failed to close during the quarter were still in the Company's sales "funnel." He explicitly denied the existence of any "negative macro trends in [MAKO's] Business."  The Company lowered its previously issued full-year 2012 guidance for the sale of the RIO system from 56-62 units to 52-58, but only enough to take into account the sales that did not close in the previous quarter.

19.     The full magnitude of the disastrous and broad-based push-back on RIO system sales did not fully come to light until July 9, 2012, when the Individual Defendants announced the Company's preliminary results for the second quarter of fiscal year 2012.  MAKO was forced to announce for the second quarter in a row that it missed its sales forecast, and that it was lowering 2012 guidance even further to 42-48 RIO system sales from its previous projection of 52-58.  The Individual Defendants finally felt compelled to acknowledge the fundamental issues facing the Company's business, which they had long known but previously failed to disclose.

20.     Specifically, the Individual Defendants acknowledged that MAKO was encountering longer "selling cycles" due to the market shift from early adopters to early majority, and that hospitals were requiring additional layers of approvals and increased surgeon support to justify the claimed return on investment.  This news shocked investors and the public at large. Just one month earlier, defendant Ferré had reaffirmed the Company's revised guidance and expressed confidence that the Company would reach its projected sales.  The next day, MAKO's

stock price dropped precipitously, declining 43% – the largest drop since MAKO stock began trading in February 2008.

21.   The revelations made in the July 9, 2012 press release and conference call have caused a significant decline in MAKO's value and have subjected the Company to incur costly public and legal scrutiny that continues to damage the Company.  Further, as a direct result of the Individual Defendants' wrongdoing, the Company is now a defendant in a factually-related federal securities class action (the "Securities Class Action") pending in the U. S. District Court for the Southern District of Florida.

22.   Plaintiff now brings this shareholder derivative action to ensure that the Individual Defendants are held to account for the injury their breaches of fiduciary duty have caused to MAKO.

## II.   JURISDICTION AND VENUE

23.   Jurisdiction is conferred by 28 U.S.C. §1332.  As alleged in greater detail below, Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

24.   This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

25.   Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) MAKO maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   THE PARTIES

### A.   Plaintiff

26.   Plaintiff Todd Deehl was a shareholder of MAKO at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current MAKO shareholder.  Plaintiff Deehl is a citizen of Kentucky.

### B.   Nominal Defendant

27.     Nominal defendant MAKO is an emerging medical device company that markets an advanced robotic arm solution and orthopedic implants for orthopedic procedures.  MAKO's primary offering is MAKOplasty, an innovative, restorative surgical solution that enables orthopedic surgeons to treat patient specific osteoarthritic disease.  MAKOplasty is performed using the Company's proprietary RIO system, a technology platform that utilizes tactile guided robotic arm technology and patient specific planning and visualization to offer consistently reproducible precision to surgeons.

28.     MAKO is a Delaware corporation with its principal place of business located at 2555 Davie Road, Fort Lauderdale, Florida.  According to the Company's Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on March 8, 2012, MAKO "conduct[s] all of [its] management activities, most of [its] research and development activities and assemble[s] many of [its] products at a single location in Fort Lauderdale, Florida."  MAKO's headquarters in Fort Lauderdale, Florida, are the actual center of direction, control, and coordination for the Company's activities, and are also the location of the annual shareholder meetings.  In addition, that is where the assembly of the Company's products occurs, where its warehouse is located, and where the acts complained of occurred.  MAKO is a citizen of Delaware and Florida.

### C.   Individual Defendants

29.     Defendant Ferré is MAKO's President, CEO, and Chairman of the Board of Directors (the "Board"), and has been since he found the Company in November 2004.  Ferré is also named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Ferré knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's business prospects.  He also breached his duty of loyalty by allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects.  As Ferré himself acknowledged on various conference calls, he was closely integrated in the day-to-day operations of the Company, and he personally monitored customer feedback, sales trends, and prospective deals in the Company's sales "funnel."  In addition, he was also responsible for developing the Company's sales guidance by assessing the relevant information

reasonably available to him and by adjusting relevant sales metrics, such as closing ratios. MAKO paid Ferré the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2011 | $417,951 | $2,283,000 | $1,262,085 | $252,156 | $3,675 | $4,218,867 |

Ferré is a citizen of Florida.

30.     Defendant LaPorte is MAKO's Senior Vice President of Finance and Administration, CFO, and Treasurer and has been since November 2004.  LaPorte is also named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  LaPorte knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's business prospects.  He also breached his duty of loyalty by allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects. As described in MAKO's conference calls, LaPorte was intimately involved in the day-to-day operations of the Company, and he monitored customer feedback, sales trends, and prospective deals in the Company's sales "funnel."  In addition, as the CFO, LaPorte was in charge of developing the Company's sales guidance by assessing the relevant information reasonably available to him and by adjusting relevant sales metrics, such as closing ratios.   MAKO paid LaPorte the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | $279,053 | $546,904 | $109,546 | $3,538 | $939,041 |

LaPorte is a citizen of Florida.

31.     Defendant Christopher C. Dewey ("Dewey") is a MAKO director and has been since the Company's inception in November 2004.  Dewey is also a member of MAKO's Audit Committee and has been since at least April 2011.  As a member of the Audit Committee, Dewey was specifically charged with reviewing and discussing all earnings press releases and financial information and earnings guidance provided to analysts and rating agencies prior to their publication.  Dewey knowingly or recklessly breached his duty of loyalty by: (i) reviewing and approving improper statements concerning the Company's business prospects; and (ii)

allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects.  Given, among other things: (i) his duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed system units; (v) the materiality of every single RIO system sale to the Company's projections and profitability; and (vi) the fact that he's been a director ever since the Company's inception in November 2004, Dewey knew or in conscious disregard of his duties failed to know that the Company's sales projections and false assurances were highly misleading.  Further, as an Audit Committee member, Dewey reviewed all reasonably available information and knew or consciously disregarded the fact that there were no adequate bases in fact to support the Company's 2012 earnings projections. MAKO paid Dewey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $35,500 | $44,565 | $80,065 |

Dewey is a citizen of New Jersey.

32.     Defendant S. Morry Blumenfeld ("Blumenfeld") is a MAKO director and has been since July 2005.  Blumenfeld knowingly or recklessly breached his duty of loyalty by allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects. Given, among other things: (i) his duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed RIO system units; (v) the materiality of every single RIO system sale to the Company's projections and profitability; and (vi) the fact that he's been a director since MAKO's beginning and before the Company went public, Blumenfeld knew or in conscious disregard of his duties failed to know that the Company's sales projections and false assurances were highly misleading.  MAKO paid Blumenfeld the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $32,500 | $44,565 | $77,065 |

Blumenfeld is a citizen of Israel.

33.     Defendant Charles W. Federico ("Federico") is MAKO's Independent Lead Director and has been since March 2009 and a director and has been since June 2007.  Federico knowingly or recklessly breached his duty of loyalty by allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects.  Given, among other things: (i) his duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed RIO system units; (v) the materiality of every single RIO system sale to the Company's projections and profitability; and (vi) the fact he's been a director since MAKO's beginning and before the Company went public, Federico knew or in conscious disregard of his duties failed to know that the Company's sales projections and false assurances were highly misleading.  MAKO paid Federico the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $51,500 | $89,130 | $140,630 |

Frederico is a citizen of North Carolina.

34.     Defendant Frederic H. Moll ("Moll") is a MAKO director and has been since August 2007.  Moll knowingly or recklessly breached his duty of loyalty by allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects.  Given, among other things: (i) his duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed RIO system units; (v) the materiality of every single RIO system sale to the Company's projections and profitability; and (vi) the fact that he's been a director since MAKO's beginning and before the Company went public, Moll knew or in

conscious disregard of his duties failed to know that the Company's sales projections and false assurances were highly misleading.  MAKO paid Moll the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $34,000 | $44,565 | $78,565 |

Moll is a citizen of California.

35.     Defendant William D. Pruitt ("Pruitt") is a MAKO director and has been since June 2008.  Pruitt is also Chairman of MAKO's Audit Committee and has been since at least April 2011.  As a member of the Audit Committee, Pruitt was specifically charged with reviewing and discussing all earnings press releases and financial information and earnings guidance provided to analysts and rating agencies prior to their publication.  Pruitt knowingly or recklessly breached his duty of loyalty by: (i) reviewing and approving improper statements concerning the Company's business prospects; and (ii) allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects.  Given, among other things: (i) his duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed RIO system units; (v) the materiality of every single RIO system sale to the Company's projections and profitability; and (vi) the fact he's been a director since shortly after the Company went public, Pruitt knew or in conscious disregard of his duties failed to know that the Company's sales projections and false assurances were highly misleading.  Further, as an Audit Committee member, Pruitt reviewed all reasonably available information and knew or consciously disregarded the fact that there were no adequate bases in fact to support the Company's 2012 earnings projections.  MAKO paid Pruitt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $35,000 | $44,565 | $79,565 |

Pruitt is a citizen of Florida.

36.     Defendant John G. Freund ("Freund") is a MAKO director and has been since October 2008.   Freund knowingly or recklessly breached his duty of loyalty by allowing

defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects.  Given, among other things: (i) his duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed RIO system units; (v) the materiality of every single RIO system sale to the Company's projections and profitability; and (vi) the fact that he's been a director since shortly after the Company went public, Freund knew or in conscious disregard of his duties failed to know that the Company's sales projections and false assurances were highly misleading.  MAKO paid Freund the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $33,500 | $44,565 | $78,065 |

Freund is a citizen of California.

37.     Defendant Richard R. Pettingill ("Pettingill") is a MAKO director and has been since August 2010.  Pettingill is also a member of MAKO's Audit Committee and has been since at least April 2011.  As a member of the Audit Committee, Pettingill was specifically charged with reviewing and discussing all earnings press releases and financial information and earnings guidance provided to analysts and rating agencies prior to their publication.  Pettingill knowingly or recklessly breached his duty of loyalty by: (i) reviewing and approving improper statements concerning the Company's business prospects; and (ii) allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects.  Given, among other things: (i) his duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed RIO system units; and (v) the materiality of every single RIO system sale to the Company's projections and profitability, Pettingill knew or in conscious disregard of his duties failed to know that the Company's sales projections and false assurances were highly misleading. Further, as an Audit Committee member, Pettingill reviewed all reasonably available information

and knew or consciously disregarded the fact that there were no adequate bases in fact to support the Company's 2012 earnings projections.  MAKO paid Pettingill the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $35,000 | $44,565 | $79,565 |

Pettingill is a citizen of California.

38.     Defendant John J. Savarese ("Savarese") was a MAKO director from October 2008 to July 2012.  Savarese knowingly or recklessly breached his duty of loyalty by allowing defendants to cause, or by himself causing, the Company to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects.  Given, among other things: (i) his duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed RIO system units; (v) the materiality of every single RIO system sale to the Company's projections and profitability; and (vi) the fact that he's been a director since shortly after the Company went public, Savarese knew or in conscious disregard of his duties failed to know that the Company's sales projections and false assurances were highly misleading.  MAKO paid Savarese the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2011 | $34,000 | $44,565 | $78,565 |

Savarese is a citizen of California.

39.     The defendants identified in ¶¶28-29 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶28, 30-37 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶30, 34, 36 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶28-37 are referred to herein as the "Individual Defendants."

## IV.  DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.  Fiduciary Duties

40.     By reason of their positions as officers, directors, and/or fiduciaries of MAKO and because of their ability to control the business and corporate affairs of MAKO, the

Individual Defendants owed and owe MAKO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MAKO in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MAKO and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

41.     Each officer and director of the Company owes to MAKO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**B.     Additional Duties of the Audit Committee Defendants**

42.     In addition to their general fiduciary duties, the Audit Committee Defendants, Dewey, Pettingill, and Pruitt, owed and owe specific additional duties to MAKO under the Company's Audit Committee Charter, which has been in effect since August 2010. These duties include assisting the Board in monitoring the quality and integrity of the Company's financial statements, supervising the Company's compliance with legal and regulatory requirements, and policing the Company's internal controls and procedures. According to the Audit Committee Charter, the following duties and responsibilities have been delegated by the Board to the Audit Committee Defendants:

> ***Review and discuss the quarterly financial statements***, including Management's Discussion and Analysis of Financial Condition and Results of Operations, with management and the independent auditors ***prior to the filing of the Company's Quarterly Report on Form 10-Q***. Also, the Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards.
>
> *   *   *
>
> ***Review and discuss any earnings press releases, as well as financial information and earnings guidance*** provided to analysts and rating agencies prior to their publication.
>
> ***Review management's assessment of the effectiveness of internal control over financial reporting*** as of the end of the most recent fiscal year and

the independent auditors' report on internal control over financial reporting. The Committee shall discuss with management, the internal auditors, and the independent auditors the adequacy and effectiveness of internal control over financial reporting, including any significant deficiencies or material weaknesses identified by management of the Company in connection with its required quarterly certifications under Section 302 of the Sarbanes-Oxley Act. In addition, the Committee shall discuss with management, the internal auditors, and the independent auditors any significant changes in internal control over financial reporting that are disclosed, or considered for disclosures, in the Company's periodic filings with the SEC. The Committee will also review the policies and procedures with respect to officer's expense accounts and perquisites, including use of corporate assets and consider the results of any review of these areas by the internal auditor or the independent auditor.

*  *  *

*Exercise oversight over management's performance of its responsibility for the preparation, presentation, and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for implementing and maintaining internal control over financial reporting*.

**C.** **Code of Business Conduct and Ethics**

43.     MAKO displays on its website the Company's Code of Business Conduct and Ethics (the "Code"). The Code requires all of the Company's "directors, employees and agents" to comply with the Company's policies. The Individual Defendants were and are subject to the Code. The Code provides that employees who violate its provisions will be subject to severe disciplinary action, "up to and including discharge from the Company and, where appropriate, civil liability and criminal prosecution." Some of the business practices and procedures covered by the Code include:

**9. Record-Keeping and Disclosures**

*The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions and to provide full, fair, accurate and timely disclosure pursuant to the rules and requirements of the SEC or otherwise.*

**D.** **Control, Access, and Authority**

44.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of MAKO, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

45.     Because of their advisory, executive, managerial, and directorial positions with MAKO, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of MAKO.  While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company's business prospects.

46.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MAKO, and was at all times acting within the course and scope of such agency.

**E.      Reasonable and Prudent Supervision**

47.     To discharge their duties, the officers and directors of MAKO were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of MAKO were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how MAKO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

### F.      Breaches of Duties

48.      Each Individual Defendant, by virtue of his position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of MAKO, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.   The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants, who collectively comprised all of MAKO's Board.

49.      The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make improper statements regarding its business prospects.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal and improper actions.   As a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action, and it has expended, and will continue to expend, significant sums of money.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.   In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.      During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of MAKO, regarding the Individual Defendants' management of MAKO's operations and the prospects of the Company's business; and (ii) enhance the Individual Defendants' executive and directorial positions at MAKO and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of

this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

53.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

VI.     FACTUAL BACKGROUND

A.  The Early Launch of RIO System and MAKOplasty

56.     Founded in 2004, MAKO is a medical device company that markets its advanced robotic arm solution and orthopedic implants for minimally-invasive orthopedic procedures it calls MAKOplasty.  The Company markets MAKOplasty as the new wave of orthopedic procedures that will improve consistency and reproducibility of patient-specific or customized procedures to treat early to mid-stage osteoarthritic knee disease.

57.     The primary surgical procedure to treat knee osteoarthritis is either total or partial knee replacement surgery.  Total knee replacement procedures can be extremely invasive because those procedures require surgeons to make a relatively large incision in order to remove damaged cartilage and bone from the surface of the knee and then replace it with an artificial

joint.  Partial (or unicompartmental/bicompartmental) knee resurfacing is less invasive, as it only requires the surgeon to remove the diseased compartment while the healthy bone, cartilage, and other soft tissue remain intact. For patients who suffer from early to mid-stage osteoarthritis, this minimally invasive procedure is particularly beneficial and preferred over total knee replacement because it minimizes trauma and preserves as much natural bone and cartilage as possible. However, partial knee procedures are rarely done because they are very technically challenging for the surgeon.  The surgeon is required to make a smaller incision to insert and place the implant, and to execute the complex process of resurfacing the bone and balancing the soft tissue.

58.    According to the Company, its RIO system is comprised of: (i) a robotic tactile guided arm technology, and (ii) a patient-specific visualization system.  The RIO system facilitates this minimally-invasive partial orthopedic procedure by allowing the surgeon to resurface one or two diseased compartments of the knee, while preserving the healthy bone of the joint.  The first generation of RIO system was approved by the U.S. Food and Drug Administration ("FDA") in November 2005, and the first MAKOplasty procedure was performed in June 2006.  The Company secured FDA clearance for its second generation and current RIO system in December 2008, and commercially launched the RIO system in the first quarter of 2009.  Then, in September 2011, MAKO developed, launched, and added a hip application to its RIO system for use in hip Arthroplasty (or hip replacement surgery) to improve the accuracy of the hip implant placement.

A.    **MAKO's RIO System and MAKOplasty Products Constituted the Company's Core Business and Were Closely Monitored by the Individual Defendants**

59.    The Company's product line consists of a single platform – its RIO system and the associated implants used in MAKOplasty procedures.  The Company has only three revenue drivers: (i) unit sales of the Company's RIO system and MAKOplasty applications, including associated instrumentation, installation services, and training; (ii) sales of implants and disposable products utilized in both knee and hip MAKOplasty procedures; and (iii) sales of warranty and maintenance services.

60.    Of these three sources of revenue, RIO system sales and implant sales used in MAKOplasty account for virtually all of the Company's revenue.  For the year ended December 31, 2011, $78.5 million — or 92% — of MAKO's $84.5 million annual revenue was attributed to

the sale of RIO systems and implants for the performance of MAKOplasty procedures.  For the year ended December 31, 2010, $42.5 million — or more than 96% — of MAKO's $44.3 million annual revenue was attributed to the sale of RIO systems and implants for the performance of MAKOplasty procedures.  RIO system sales and performed procedures are not just MAKO's core products and services, they are virtually the only products that matter to the Company's bottom line and financial survival.

61.    The Individual Defendants themselves have consistently recognized and acknowledged the importance of the MAKOplasty platform to the Company's operations.  For example, during a February 16, 2012 analyst conference call, defendant LaPorte touted the "continued interest in our *core product line* of Partial Knee Arthroplasty, as well as our new product introduction of Total Hip Arthroplasty."  Similarly, in a March 14, 2012 Barclays Capital Global Healthcare Analyst Conference call, LaPorte discussed the Company's efforts to ensure that it was executing its "hip launch and focusing on continuing to drive that adoption and *our core business* with the partial knee."

62.    Because sales of the RIO system and its associated MAKOplasty platform represent the sole driver of the Company's revenues and future viability, the Individual Defendants closely monitored and tracked the Company's volume of RIO system sales, MAKOplasty procedures, and associated implants, and they were directly involved in developing related guidance issued to investors.

63.    Defendant Ferré has acknowledged that he was intimately involved in the Company's operations and regularly scrutinized information concerning MAKO's RIO system sales trends and guidance. In fact, during the May 7, 2012 earnings conference call, Ferré candidly stated: "I have personally spent a great deal of time looking [at] and understanding what happened in the quarter, just like I do every quarter." During the call, Ferré further emphasized his personal involvement in and careful analysis of the RIO system deals: "I personally have gone through a lot of these deals and look at it and drilled down and see where they are. And I feel that the fundamentals are in place."

64.    During the May 7, 2012 conference call, defendant Ferré also explained the Company's methodology for formulating its RIO system sales guidance, pursuant to which the Company (including, without limitation, defendants Ferré and LaPorte) carefully analyzed its RIO system sales funnel — a running ledger of prospective sales in the works — and assigned

closing ratios to each prospective sale "based on the prospects and the status of [the] sales funnel":

> [T]o give you some perspective, how we set guidance, we always -- we have always analyzed our sales funnel and assigned certain, what we call closing ratios, based on the prospects and the status of our sales funnel. We are still relatively early in the commercialization cycle. As more data becomes available, we always refine the forecast process to be more accurate. So based on what happened in Q1, we have adjusted our anticipated closing ratios for the balance of the year, which is why we elected to lower guidance. Just put another way, what we do is we look at that closing ratio and we made an adjustment, and we felt it was appropriate to be where -- we always have given guidance where we feel is a number that we can make.

65.     In the following earnings conference call on July 9, 2012, while discussing the Company's second consecutive quarter of disappointing results (as discussed in detail in Section IX, *infra*), defendant Ferré again confirmed his direct involvement in and knowledge of all relevant information concerning the Company's core operations.  He also described the hands-on process by which he evaluated the Company's future prospects and noted that "there is a lot of visibility on these deals" for the RIO system and associated implants:

> And I think, just consistently, we have performed a detailed, bottoms up analysis on our funnel, and it is something that I will always do. And it is not that this is not something new, but it is something that this time around, after missing by those 2 systems at the end of the quarter, *I went to every individual sales person in our Company. And I sat down with my team, and we went through with a lot of rigor, and trying to understand exactly where we are, and what the implications are for Q3 and for Q4*. And I will tell you, *anybody who is involved in capital sales, knows* that *there is a lot of visibility on these deals.*

66.     During an earnings conference call on August 1, 2012, defendant Ferré also stressed the granular level at which he evaluated each deal and the substantive fieldwork he personally conducted to evaluate and absorb feedback from customers.  In particular, Ferré made it clear that he had "been involved in every detail … and involved looking at every deal and what's in [MAKO's sales] funnel and qualifying these funnels."  He recounted "talking to CEOs and talking to the different administrators, talking to doctors and assessing the situation":

> Chris, you know, look -- listen, *I have been involved in every detail of this point. I am right now involved looking at every deal and what's in our funnel and qualifying these funnels, and talking to CEOs and talking to the different administrators, talking to the doctors and assessing the situation.*

And I will tell you that we are being much more thorough on the product or in this process in terms of what we're calling and what we are not. And I think it's iterative process. I think, once again, the more I look at this enough, and *I've had an opportunity to look it now over two quarters*, and I have come to the conclusion that this is very much an execution story.

67.     Defendant Ferré regularly received and reviewed data regarding prospective sales of RIO systems and monitored their progress, he was actively involved in evaluating data reflecting the progress of ongoing deals and setting the closing ratio for these prospects, and he used the cumulative information to formulate the Company's guidance for RIO system sales.

68.     In fact, all of the Individual Defendants were informed about and involved in monitoring MAKO's core operations.  MAKO is not a large company.  As of June 30, 2012, the Company had only 469 employees, and only thirty-two of those employees were members of the RIO system sales force.  It was thus feasible indeed easy, to go "to every individual sales person in [the] Company" and to discuss and devote substantial time to assessing each and every deal in the works "with a lot of rigor."   The Individual Defendants were likewise able to (and did) monitor MAKO's operations and kept abreast material concerns arising from MAKO's core operations, each RIO system sale and associated implant sales, since these were the critical drivers of the Company's operational performance and profitability, and formed the basis of the Company's published sales and earnings guidance.

69.     Indeed, the Individual Defendants carefully scrutinized each and every deal because of the significance of the loss of even just one deal had for the Company's quarterly results. As demonstrated in the Company's first and second quarterly 2012 earnings press releases (detailed *infra* at Sections VIII B. & IX), one or two deals that failed to close had enormous ramifications for the Company's revenue and ability to achieve its reported guidance. As such, the Individual Defendants made certain that they had "visibility on these deals," going as far as taking "personal site visits" to hospitals and meeting hospital administrators to gauge the interest and sales prospects presented by every deal in it funnel.

70.     The Audit Committee Defendants, in particular, were specifically charged with reviewing and discussing all earnings press releases and financial information and earnings guidance provided to analysts and rating agencies prior to their publication.  As a result, the Audit Committee Defendants had a duty to ensure that the information in MAKO's earnings press releases concerning projections about the Company's core products was accurate and

truthful.  This necessarily required the Audit Committee to review all reasonably available information and to ensure that there were adequate bases in fact to support the Company's 2012 earnings projections.  The sales-by-sale information described above, as well as the more general information about the broader dynamics affecting RIO systems sales, was readily available to the Audit Committee directors.  As discussion in Sections III.c. & IV, *supra*, the Audit Committee Defendants failed to avail themselves of this information or consciously disregarded it.

71.     In addition to the small scale nature of the workforce and Company operations, the Individual Defendants were further able to closely track the progress of the Company's sales due to the relatively small number of prospective deals in place in MAKO's sales "funnel" at any one time.  The Company closed only forty-eight RIO system sales in 2011, selling seven, twelve, eleven, and eighteen, in the first, second, third, and fourth quarters, respectively.  The Company's sales "funnel" ranged, at most, in the tens and twenties each quarter, making it easy for the Individual Defendants to track the issues in each prospective sale.

72.     The Individual Defendants monitored with little difficulty the usage rates of the installed RIO systems.  The Company only had 113 RIO system units installed as of the year-end 2011, and only118 installed units through the first quarter of 2012.

73.     The Individual Defendants' intimate knowledge of the inner-working of MAKO's operations, products, sales, and challenges is further underscored by their extensive history with the Company.  The majority of the Individual Defendants (including seven of the eight current directors) have been with MAKO since either its inception in November 2004 or from the time the Company went public in February 2008.  The Individual Defendants were certainly familiar with the Company's core business—they had helped build the Company from the ground-up and ushered its entry into the public market.  Because they were instrumental in shaping the Company from the beginning, these Individual Defendants were knowledgeable as to every aspect of the Company's business, including RIO technology, marketing strategy, and results.

## VII.    THE INDIVIDUAL DEFENDANTS WERE WELL AWARE OF THE MULTIPLE CHALLENGES UNDERMINING RIO SYSTEMS SALES IN 2012

74.     Beginning by at least January 2012 (and likely earlier), MAKO began experiencing slower sales and a "longer selling cycle [to close deals]" with its consumers (mostly medical and academic institutions).  There were two primary reasons for the declining sales and longer selling cycle.  First, MAKO's RIO system and disposable implants had moved from the "early adopters" phase of the adoption lifecycle to the "early majority" phase, which resulted in

longer "selling cycles" and made it more difficult for the Company to sell its products.  Second, MAKO's prospective customers were unconvinced about the return on their investments for the RIO system and were, therefore, demanding price reductions and requiring additional data from MAKO regarding physician adoption and use rates, safety and efficacy.

75.     **Market Shift from Early Adopters to Early Majority:**  The Individual Defendants knew or consciously disregarded the fact that MAKO's 2011 sales had been to "early adopters" — those surgeons, representing only a small portion of the industry, who had been initial supporters of MAKO's technology.  Once this small pool of customers was depleted, the Company had to focus its marketing efforts on and transition to a more sizable segment of customers — the "early majority" — in order to achieve its projection of materially increased sales in 2012.  The Individual Defendants knew that MAKO was entering a new phase in the adoption cycle of its RIO system and MAKOplasty procedures, and that the Company would have to demonstrate the value of its product to the vast majority of as-yet-unconvinced surgeons in the orthopedic community.  The Individual Defendants also knew that the Company would face immense challenges in doing so.  By at least the beginning of 2012, the Company began encountering longer selling cycles, as hospitals demanded more information and data regarding the value of the MAKOplasty platform and more internal support from surgeons in order to justify committing the substantial funds necessary to purchase MAKO products.

76.     **Bottoms-Up Adoption Strategy:**  The arduous transition from early adopters to the early majority was made even more challenging by the Individual Defendants' conscious decision to adopt a "bottoms up" marketing model.  Given the highly risky and highly regulated market for new medical technologies, and the manner in which most new technologies and procedures proliferate among physicians, most medical technology companies employ "top-down" market introduction strategies that seek to deploy new devices with KOLs, with the expectation that they will influence other physicians.  The Individual Defendants, however, authorized a strategy that involved marketing the RIO system and MAKOplasty for its knee procedures to local community-based hospitals and smaller hospitals that had little (if any) influence on the rest of the industry.  This unorthodox, bottoms-up strategy imposed significant hurdles to the Company's efforts to grow adoption beyond the early adopters, and effectively imposed a ceiling on the Company's ability to reach hospitals and surgeons beyond the local community-based and smaller hospitals.  The Individual Defendants knew (or in conscious

disregard of their duties failed to know) that increases in adoption and sales of the RIO system would be constrained by the Company's bottoms-up adoption strategy because it excluded almost all of the larger and more influential medical institutions that typically drive adoption rates at other institutions.

77.     Analysts following MAKO questioned the wisdom of the Company's bottoms-up adoption strategy and its impact on sales in various reports throughout the first half of 2012 — issues the Individual Defendants refused to acknowledge were negatively impacting sales.  For example, a January 9, 2012 Canaccord Genuity Analyst Report stated:

> Community hospital sales-based strategy might limit penetration - Most medical device companies utilize a traditional strategy of focusing on top tier hospitals and surgeons, promoting a trickle down effect to lower tier hospitals and surgeons. MAKO, on the other hand, is focusing on rural, lower tier hospitals and surgeons first. ***This sales strategy could significantly limit penetration into the market***.

78.     In a May 15, 2012 report entitled "Throwing Out the Baby?," Morgan Stanley & Co. LLC confirmed the weaknesses of MAKO's bottoms-up approach, concluding that ***"adoption will be more labored at smaller hospitals where lower utilization decreases MAKO's value proposition."***

79.     Analysts from JP Morgan Securities LLC ("JP Morgan") echoed these sentiments in their May 21, 2012 report entitled, "After the Fall: Our Doc Feedback and Thoughts on Where MAKO Goes from Here." According to the report, ***surgeons "didn't see the clinical benefit of R[IO]"*** and identified "***more clinical data***" and "***adoption by local thought leaders versus community hospitals"*** as two key factors necessary to help ***"get them onboard"*** with the RIO system.

80.     <u>**Slower Selling Cycle Due to Pricing Pressures and Return on Investment:**</u> The shift from early adopters to the early majority of target customers also revealed the pricing pressures now facing the Company.  The initial adopters were already enamored with the capabilities of the RIO system and, therefore, were undaunted by the substantial financial investment necessary to commit to MAKOplasty and its accompanying products.  The vast majority of potential buyers and users in the orthopedic community were not so indifferent about the product costs.  Defendant Ferré admitted during the May 7, 2012 earnings conference call that deals were falling through because hospitals were requesting price cuts.  In addition, MAKO's bottoms-up adoption strategy made it more difficult for the Company to garner

significant support for its products and convince wary hospitals and surgeons that the RIO system would provide a significant return on investment.

81.     In a May 8, 2012 report entitled "Tough Quarter Resets Expectations; Lowering Estimates," JP Morgan described the pricing pressures facing the Company. The report specifically cited to (among other things) "reluctance among physicians, or hospital administrators, to use or purchase the M[AKO] system on the basis of cost" as one of the risks encumbering future sales.

82.     **Insufficient Resources to Affect Industry Opinion:** Further exacerbating the Company's slowing sales issues was the fact that MAKO had insufficient resources dedicated to sales and marketing to be able to create a shift in industry practices, from the traditional manual complete knee procedures to the new implant customization procedures that MAKOplasty offered.  The Individual Defendants knew (or in conscious disregard of their duties failed to know) that MAKO did not have the sufficient personnel to change the tide of opinion in favor of implant customization at the rapid pace their sales guidance (discussed below) suggested, particularly without major help from KOLs.  Canaccord Genuity's January 26, 2012 investment report noted that despite RIO's technological promise, uptake by orthopedic surgeons was likely to be slow:

> While management of large ortho companies continue to deny its potential, we continue to believe it is not a matter of IF implant customization will become the gold standard in large joint reconstruction but a matter of WHEN it will become the gold standard. ***Currently, MAKO Surgical*** and ConforMIS (private) have game-changing technology, in our opinion, but ***unfortunately do not have the sales and marketing power to change the current practices in orthopedics overnight***.

83.     **Inefficiencies in Hip Application:** Having closely monitored and personally reviewed the information regarding the Company's core product, the RIO system, and its newly launched hip application, the Individual Defendants knew that MAKO was receiving substantial negative feedback and pushback from surgeons regarding the Company's hip application.  As analysts reported, and as defendant LaPorte alluded to during the February 16, 2012 Leerink Swann Global Health Care conference call, surgeons using the MAKOplasty platform for hip procedures were complaining about the "lack of 'quality' implants, obstruction of the robotic arm [when using the RIO system], and [an extended] procedure time/learning curve."

84.     In addition to the inefficiencies identified in the hip applications, the Company lacked the necessary studies and information showing the clinical benefits of the MAKOplasty platform for hip procedures.  The January 9, 2012 Canaccord Genuity analyst report summarized the issues as follows:

> Hip MAKOplasty platform not fully developed yet - There continues to be a lot of hype around the hip MAKOplasty platform, given the very large market opportunity. However, from our channel checks with some of the early users of the product, we believe that it is still too early to tell whether the benefits outweigh the challenges. Specifically, ***the pushback we hear from surgeons centers on the lack of "quality" implants, obstruction of the robotic arm, and procedure time/learning curve. Furthermore, we believe the lack of data showing the clinical benefits could keep most surgeons skeptical of the need for robotic assistance.***

85.     **Misleading Utilization Figures:** Finally, the Individual Defendant knew (or in conscious disregard of their duties failed to know) that the Company's RIO system utilization rates were skewed because a high concentration of high volume surgeons using RIO systems had been primarily responsible for MAKO's impressive utilization rate figures.   In fact, the Company's positive utilization rates concealed the numerous centers in which RIO systems were hardly being utilized at all, and they created the misleading impression that usage of RIO systems was up across the board.  Canaccord Genuity reported on this issue in their January 9, 2012 report:

> High concentration of high volume surgeons - We believe that many investors have been impressed with the utilization rates of the RIO System installed base. However, ***through our channel checks, we believe that there could be a high concentration of high volume surgeons boosting these figures. Thus, we believe there are a number of centers with very low utilization rates, meaning the platform could be a niche solution for a small segment of the market***. However, given the fairly early stages of market adoption, we believe it is too early to make a definitive call on this topic.

## VIII.   THE INDIVIDUAL DEFENDANTS DISSEMINATE AND/OR CAUSE MAKO TO DISSEMINATE MISLEADING STATEMENTS REGARDING RIO SYSTEM SALES

86.     Beginning in at least January 2012, the Individual Defendants repeatedly misled investors by disseminating and/or or causing or permitting the Company to disseminate false and misleading RIO system sales projections that lacked any reasonable basis in fact when made and that were contradicted by the foregoing undisclosed material negative facts.  The Individual Defendants knew, or in conscious disregard of their duties failed to know, that these RIO system

sales projections not only were unsupported by the information to which the Individual Defendants were privy, but were actually directly contradicted by such information. Notwithstanding the panoply of information undermining their aggressive sales projections for 2012, the Individual Defendants continued to make the same misleading 2012 projections until they could not conceal the truth behind the Company's slowing sales trends anymore after two straight earnings projections misses.

### A.    The Individual Defendants Issue Misleading 2012 Guidance

87.    On January 9, 2012, MAKO issued a press release announcing selected operating results for the fourth quarter and full-year 2011, which included the number of RIO systems sold, the number of MAKOplasty procedures performed in 2011, and the Company's 2012 annual guidance.  In this press release, defendant Ferré touted the Company's "strong RIO system sales" during the previous quarter and suggested a continuation of this positive trend in the Company's business, stating that "MAKO anticipates that it will sell 56 to 62 RIO systems" in 2012.  The press release stated in part:

> "*We are pleased with our strong RIO system sales and the interest in our hip application during the fourth quarter.  In addition, we believe the increased MAKOplasty procedure volume and utilization trends continue to demonstrate the clinical value of our technology*," said Maurice R. Ferré, M.D., President and Chief Executive Officer of MAKO.  "*2011 was a positive year for MAKO and we look forward to continuing to drive the adoption of MAKOplasty in 2012*."

> **2012 Annual Guidance**

> *MAKO anticipates that it will sell 56 to 62 RIO systems and that its customers will perform 11,000 to 13,000 MAKOplasty procedures in 2012*.

88.    The Company's January 9, 2012 press release was false and misleading.  The Company's bullish 2012 guidance lacked a reasonable basis in fact because the Individual Defendants knew the following adverse facts (provided in further detail above in Section VII), which undermined any possibility that the Company would achieve the 16% to 29% year-over-year growth projected by its 2012 guidance, let alone reach the same sales figures it did in 2011: (i) the Company had exhausted its consumer base of early adopters and was entering a new phase in the adoption lifecycle of its RIO system and MAKOplasty procedures, which would require MAKO to demonstrate the value of its product to the early majority of as-yet-unconvinced surgeons in the orthopedic community; (ii) the Company implemented a bottoms-up adoption strategy that imposed significant hurdles to the Company's efforts to grow adoption beyond the

early adopters to the early majority; (iii) the Company was facing longer selling cycles due to pricing pressures and demand from hospitals for more clinical data and surgeon support to establish favorable return on investments; (iv) the Company had insufficient marketing and sales resources to shift industry practices from manual complete knee procedures to the new implant customization procedures that MAKOplasty offered; (v) MAKO was receiving significant negative feedback and pushback from surgeons regarding its newly-launched hip application; and (vi) its utilization figures were skewed and did not support across-the-board adoption of the MAKOplasty platform.

89.    The Individual Defendants did not disclose these significant adverse facts to shareholders, and, as alleged in more detail below, affirmatively denied the importance of all but idiosyncratic problems unique to a few potential buyers.  In short, the Individual Defendants publicly represented that the Company's sales were ramping up, when, in fact, as they knew or consciously disregarded, sales were slowing and the Company was hard-pressed to achieve the same sales figures.  As described *supra* in Section VI, the Individual Defendants, and in particular defendant Ferré, were intimately familiar with these adverse facts because RIO system sales and associated MAKOplasty procedures represented the Company's core operations and the single-most important metrics driving revenue.  Indeed, every deal was closely scrutinized, every relevant piece of information was digested, and MAKO's RIO system sales force was closely monitored by the Individual Defendants to assess the Company's business prospects for volume sales of its RIO system.

90.    On February 16, 2012, the Company participated in the Leerink Swann Global Health Care Conference and provided an overview of MAKO's operations.  During the Leerink Swann conference call, defendant LaPorte reaffirmed the Company's misleading 2012 RIO system sales guidance of "56 to 62 new RIO Systems" despite admitting that the Company was moving past the early adoption stage to the majority stage and was experiencing pushback in connection with MAKO's recently launched hip application:

[ANALYST]

And what about on the doctor training front? Can you talk about – I think at your Analyst Day, you mentioned a couple of new initiatives to – on both the Hip and the Knee side. Can you talk about those?

[LAPORTE]

Sure. So on the training front there, we're not changing the way the procedure is done. That's important for us to incorporate a surgical workflow that exists today that surgeons are comfortable with. So the learning curve is relatively quick for first-time users. We actually did a study on our Partial Knee side and saw it took about 15 procedures for a surgeon to become time-neutral and comfortable with the procedure. So – but the advanced training that you've referred to is we offer BioSkills courses that we've talked about previously, and we do about a dozen of these a year across the U.S. And they are in multi-purpose training venue where we can train new surgeons or perspective surgeons so it's actually part of the sales process for pushing and moving prospects throughout our sales funnel, as well as training additional surgeons at existing sites.

And from an advanced training perspective, for surgeons who maybe have adopted MAKOplasty but aren't as efficient as they'd like to be, we have some proctors from our more high volume-sites that are helping us with basically doing advanced training to help surgeons become more efficient with the procedure, more comfortable with it. ***And we just – we're just launching that program now, which we see as kind of the next stage really of where we are on – from a market adoption and kind of growth within our commercialization***.

[ANALYST]

On that topic of coming up the learning curve and how long it takes to get time-neutral, maybe even more up to address the Hip side of things, ***what's the – what would you say is – is that one of the bigger sources of, I mean for lack of a better word, push back if there is push back at the surgical time?*** What are physicians most concerned about as they learn about the benefits of MAKOplasty?

[LAPORTE]

***So time is definitely a consideration***, ***particularly for high-volume surgeons that are comfortable with doing it***. So it is one of the areas. ***We haven't actually performed the learning curve study yet.*** I think it's a little early for that, but as we get a little further here on the adoption, we'll initiate a – we have planned study on the Hip side to address learning curve or evaluate the learning curve.

Initially, we believe that it will be somewhere around the same timeframe of approximately 15 procedures, and right now on average, ***you might hear from a hip surgeon who's began with the MAKOplasty Hip application that it adds approximately 10 minutes to their procedure***. The tradeoff there is the accuracy ultimately in a better clinical outcome. And so it is one area though, ***particularly for those surgeons who are new maybe that haven't used – new to navigation because there is obviously a navigation component of our technology, and that's really where the added time is*** on things such as registration and so forth.

But we hope to – *the Hip's still early, so as we work through this, we hope to progress similar to what we've done in the Partial Knees and help get surgeons down that curve quicker*.

91.     In the Leerink Swann conference call, defendant LaPorte also discussed the process by which the Company formulated its sales guidance for 2012.  LaPorte stated that among the considerations that factored into the Company's projections were "the age and experience of [MAKO's] sales force" and the "sales pipeline," including identifying prospective "qualified physicians and accounts, meaning medium to high volume joint surgeon at a hospital that might be technology-savvy, and to the other end of the spectrum where we have a surgeon champion identified and maybe negotiating with them."  According to LaPorte, those factors supported the basis for the Company's 2012 guidance:

[ANALYST]

And as you look to further penetrating that 1,200 hospital target base and you've provided guidance for 56 to 62 for 2012, could you just talk about how you'd get to a number like that? And that's a large number hospitals to come up with that number and how do you formulate your guidance?

[LAPORTE]

Sure. So it's based on a couple factors. *First, it's based on kind of the age and experience of our sales force. So at the end of last year, we had 32 sales team members on our RIO capital sales force. We have two separate sales forces. And we added about seven of those in between Q3 and Q4 to gear up for this year. It takes a little while for them to come up the curve, we feel about six months or so for them to be productive. So that's one variable.*

*And then the other is basically just looking at our sales pipeline*. So we look at the pipeline, everything from qualified physicians and accounts, *meaning medium to high volume joint surgeon at a hospital that might be technology-savvy, and to the other end of the spectrum where we have a surgeon champion identified and maybe negotiating with them*. So with that input, we basically come up with what is our best estimate of what we could achieve this year.

92.     Statements made by defendant LaPorte during the Company's February 6, 2012 Leerink Swann conference call were false and misleading.  In particular, the Company's bullish 2012 guidance reaffirmed by LaPorte lacked a reasonable basis in fact because the Individual Defendants knew the following adverse facts (provided in further detail above in Section VII), which undermined any notion that the Company would achieve the 16% to 29% year-over-year growth projected by its 2012 guidance, much less even reach the same sales figures it did in

- 31 -

2011: (i) the Company had exhausted its consumer base of early adopters and was entering a new phase in the adoption lifecycle of its RIO system and MAKOplasty procedures, which would require MAKO to demonstrate the value of its product to the early majority of as-yet-unconvinced surgeons in the orthopedic community; (ii) the Company implemented a bottoms-up adoption strategy that imposed significant hurdles to the Company's efforts to grow adoption beyond the early adopters to the early majority; (iii) the Company was facing longer selling cycles due to pricing pressures and demand from hospitals for more clinical data and surgeon support to establish favorable return on investments; (iv) the Company had insufficient marketing and sales resources to shift industry practices from manual complete knee procedures to the new implant customization procedures that MAKOplasty offered; (v) MAKO was receiving significant negative feedback and pushback from surgeons regarding its newly-launched hip application; and (vi) its utilization figures were skewed and did not support across-the-board adoption of the MAKOplasty platform.  Defendant LaPorte did not disclose these significant adverse facts to shareholders, and, as alleged in more detail below, affirmatively denied the importance of all but idiosyncratic problems unique to a few potential buyers.  In short, LaPorte publicly represented that the Company's sales were ramping up, when, in fact, as he knew or consciously disregarded that sales were slowing and the Company was hard-pressed to achieve the same sales figures.

93.   LaPorte's statements were further misleading and improper because he failed to disclose the full extent of the material pushback that the Company was experiencing in connection with its widely-lauded and recently launched hip application.  In fact, LaPorte failed to disclose that surgeons using the MAKOplasty platform for hip procedures had been complaining about the "lack of 'quality' implants, obstruction of the robotic arm [when using the RIO system], and [an extended] procedure time/learning curve."  In addition to these inefficiencies, the Company lacked the necessary studies and information supporting the clinical benefits of the MAKOplasty platform for hip procedures, further muting any accretive qualities that the hip application would have on short-term RIO system sales.  As described supra in Section VI, LaPorte was intimately familiar with these adverse facts because RIO system sales and associated MAKOplasty procedures represented the Company's core operations and the single-most important metrics driving revenue.  Indeed, every deal was closely scrutinized, every

relevant piece of information was digested, and MAKO's RIO system sales force was closely monitored to assess the Company's business prospects for volume sales of its RIO system.

94.    On March 6, 2012, the Company issued a press release reporting MAKO's operating results for the fourth quarter and full-year 2011.  In this press release, defendant Ferré once again touted the Company's positive results in 2011 and falsely represented that these results would continue in 2012.   Specifically, Ferré stated (among other things) that he "anticipate[s] that [MAKO's] positive results in 2011 will carry forward into 2012":

> "We are pleased with our strong operating results for the fourth quarter and the full year 2011, particularly our 91% growth in revenue from the prior year.  *In addition, we believe the increased level of RIO system sales, initial interest in our hip application, increased MAKOplasty procedure volume and utilization trends point to the clinical value of our technology*" said Maurice R. Ferré, M.D., President and Chief Executive Officer of MAKO.  "*We anticipate that our positive results in 2011 will carry forward into 2012 as we continue to drive the adoption of MAKOplasty*."

95.    After releasing its fourth quarter and year end fiscal 2011 financial results on March 6, 2012, MAKO hosted an analyst conference call the same day.  During the call, defendants Ferré and LaPorte affirmed the Company's 2012 sales and disclosed that the Company expected one-third of the sales to close in the first half of 2012, and the remaining two-thirds to close during the second half of 2012:

> *Turning to guidance, we are continuing to provide annual guidance on RIO System sales and total annual MAKOplasty procedures. As stated in our January 9 press release, we anticipate that in 2012, we will sell 56 to 62 RIO Systems worldwide and, similar to prior years, we expect that one-third of system sales will occur in the first half of the year and two-thirds will occur in the second half of the year*. We also anticipate that our customers will perform 11,000 to 13,000 MAKOplasty procedures and we expect that 40% of these procedures will be performed in the first half of the year and 60% will be performed in the second half.

96.    These statements in the Company's March 6, 2012 press release and conference call were false and misleading.  In particular, defendant Ferré had no basis in fact for "anticipat[ing] … positive results in 2011 will carry forward into 2012," particularly because he (and his fellow Individual Defendants) knew the following adverse facts (provided in further detail above in Section VII), which undermined any notion that the Company would achieve the 16% to 29% year-over-year growth projected by its 2012 guidance, much less even reach the same sales figures it did in 2011: (i) the Company had exhausted its consumer base of early

adopters and was entering a new phase in the adoption lifecycle of its RIO system and MAKOplasty procedures, which would require MAKO to demonstrate the value of its product to the early majority of as-yet-unconvinced surgeons in the orthopedic community; (ii) the Company implemented a bottoms-up adoption strategy that imposed significant hurdles to the Company's efforts to grow adoption beyond the early adopters to the early majority; (iii) the Company was facing longer selling cycles due to pricing pressures and demand from hospitals for more clinical data and surgeon support to establish favorable  return on investments; (iv) the Company had insufficient marketing and sales resources to shift industry practices from manual complete knee procedures to the new implant customization procedures that MAKOplasty offered; (v) MAKO was receiving significant negative feedback and pushback from surgeons regarding its newly-launched hip application; and (vi) its utilization figures were skewed and did not support across-the-board adoption of MAKOplasty platform.

97.    The Individual Defendants did not disclose these facts to shareholders, and later urged shareholders to believe that any sales MAKO failed to close were due to issue unique to each potential buyer.   In short, the Individual Defendants publicly represented that the Company's sales were ramping up, when, in fact, as they knew or consciously disregarded, sales were slowing and the Company was hard-pressed to achieve the same sales figures.   As described supra in Section VI, the Individual Defendants, and in particular Ferré, were intimately familiar with these adverse facts because RIO system sales and associated MAKOplasty procedures represented the Company's core operations and the single-most important metrics driving revenue.  Indeed, every deal was closely scrutinized, every relevant piece of information was digested, and MAKO's RIO system sales force was closely monitored by the Individual Defendants to assess the Company's business prospects for volume sales of its RIO system.

98.    On March 14, 2012, MAKO participated in the Barclays Capital Global Healthcare Conference.   During the conference call held in conjunction with the Barclays conference, defendant LaPorte reiterated the Company's guidance for RIO system sales and disclosed that the utilization rate was one of the metrics "supporting guidance":

> Our guidance has been focused on two key metrics -- system placements and procedures. We give annual guidance, not quarterly guidance. Particularly on the systems sales side quarterly could be lumpy, a little harder to predict.

*But for 2012 our annual guidance for system placements is 56 to 62 RIO systems*. We sold in total 48 in 2011. From a procedure standpoint it is 11,000 to 13,000 procedures; again we did just under 7,000 last year.

*Some of the other metrics on our fourth-quarter call that we talked about relative to supporting guidance is utilization*. We came off a strong Q4 utilization. We measure that in average monthly utilizations per system, and that was 7.2.

99.     During the Barclays Capital conference call, defendant LaPorte noted analysts' concerns regarding the impact of pricing and return on investment push-back on the Company's customers and sales prospects, but argued that the macroeconomic issues underlying these concerns had been factored into MAKO's guidance and re-affirmed that guidance:

*I think hospitals are still keeping tight purse strings on their overall spending*, and as you alluded to I think, with a little bit of uncertainty around where healthcare and the reform might go ultimately. *But we are seeing them continue to invest in capital that has a good economic story and return on investment*.

*I think that is where with our partial knee business -- and hopefully we can demonstrate that as well in hip -- that we provide that value and have continued to see in all those macroeconomic environment considerations, to the extent we can predict them or understand where they might be going, are all factored into our guidance*.

100.     These Statements were improper and misleading.  In particular, the Company's bullish 2012 guidance reaffirmed by defendant LaPorte lacked a reasonable basis in fact because he (and his fellow Individual Defendants) knew the following adverse facts (provided in further detail above in Section VII), which undermined any notion that the Company would achieve the 16% to 29% year-over-year growth projected by its 2012 guidance, much less even reach the same sales figures it did in 2011: (i) the Company had exhausted its consumer base of early adopters and was entering a new phase in the adoption lifecycle of its RIO system and MAKOplasty procedures, which would require MAKO to demonstrate the value of its product to the early majority of as-yet-unconvinced surgeons in the orthopedic community; (ii) the Company implemented a bottoms-up adoption strategy that imposed significant hurdles to the Company's efforts to grow adoption beyond the early adopters to the early majority; (iii) the Company was facing longer selling cycles due to pricing pressures and demand from hospitals for more clinical data and surgeon support to establish favorable return on investments; (iv) the Company had insufficient marketing and sales resources to shift industry practices from manual

complete knee procedures to the new implant customization procedures that MAKOplasty offered; (v) MAKO was receiving significant negative feedback and pushback from surgeons regarding its newly-launched hip application; and (vi) its utilization figures were skewed and did not support across-the-board adoption of MAKOplasty platform.  LaPorte did not disclose these significant adverse facts to shareholders, and, as alleged in more detail below, affirmatively denied the importance of all but idiosyncratic problems unique to a few potential buyers.  In fact, while LaPorte vaguely referenced the "tight purse strings" that hospitals were keeping on their overall spending, he misleadingly represented that this fact would not affect RIO system sales because these hospitals would "invest in capital that has a good economic story and return on investment."

101.   These statements were particularly misleading because, as the Individual defendants knew and failed to fully disclose, the Company was experiencing longer selling cycles because hospitals were unconvinced that MAKO's expensive RIO system product would render a favorable return on investment without further surgeon support.  In short, the Individual Defendants publicly represented that the Company's sales were ramping up, when in fact, as they knew or consciously disregarded, sales were slowing and the Company was hard-pressed to achieve the same sales figures.  As described *supra* in Section VI, the Individual Defendants, and in particular LaPorte, were intimately familiar with these adverse facts because RIO system sales and associated MAKOplasty procedures represented the Company's core operations and the single-most important metrics driving revenue.  Indeed, every deal was closely scrutinized, every relevant piece of information was digested, and MAKO's RIO system sales force was closely monitored by the Individual Defendants to assess the Company's business prospects for volume sales of its RIO system.

**B.    As the Company Struggles to Meet Its 2012 Guidance, the Individual Defendants Continue to Conceal the True Facts Underlying MAKO's Dismal RIO System Sales**

102.   The first signs that MAKO would miss its 2012 guidance surfaced on May 7, 2012, when the Company issued a press release announcing disappointing operating results for the first quarter of 2012 ending March 31, 2012.  The Company announced that it had only sold six of its RIO systems, missing the average analyst target of nine placements by 33%.

103.   Defendant Ferré acknowledged that the RIO system sales for the quarter "were at the low end of [the Company's] expectations," even when taking into account the fact the first

quarter of the year is "typically [the Company's] slowest quarter of the year."  The Company missed analysts' revenue expectations by a wide margin, as revenue for the first quarter of 2012 dropped approximately 40% from the fourth quarter of 2011 and missed analysts' consensus expectations by approximately 20%.

104.    The number of procedures executed during the period also declined and missed expectations by approximately 5%, while the average monthly utilization rate per system dipped to 6.6 procedures, below the 7.2 procedures figure reported in the fourth quarter of 2011.

105.    As a result the Company announced that it would lower its 2012 Guidance to fifty-two to fifty-eight RIO systems, compared to its previously issued guidance of fifty-six to sixty-two RIO systems. The press release stated in part:

> RIO Systems – *Six RIO systems were sold during the first quarter*, of which five were sold to domestic customers and one was sold to our distributor in Japan, for use in securing regulatory approvals and to demonstrate MAKOplasty to build interest in that market.  *These six RIO systems bring MAKO's worldwide commercial installed base of RIO systems to 118 systems and domestic commercial installed base to 116 systems* as of March 31, 2012.  The revenue associated with the sale of the international system was deferred due to a contingent obligation to reimburse the distributor for the costs it incurs in the regulatory process should the agreement be terminated prior to obtaining regulatory approval.  The revenue associated with this sale will be recognized upon obtaining regulatory approval.

> *   *   *

> "*While the first quarter is typically our slowest quarter of the year and system placements are very difficult to predict on a quarterly basis, our results this quarter were at the low end of our expectations*," said Maurice R. Ferré, M.D., President and Chief Executive Officer of MAKO.  "On the positive side, *we were encouraged by the continued interest shown in our hip application and the quality and quantity of clinical data that continues to be generated that supports the clinical and economic benefit of MAKOplasty*.  Additionally, we are pleased to have enhanced our working capital flexibility through a credit facility arrangement with Deerfield, an acknowledged leader in health care investing."

> 2012 First Quarter Financial Review

> *   *   *

> Outlook

> *Based on the slower than expected start to the year, MAKO now anticipates selling 52 to 58 RIO systems in 2012, which compares to prior guidance of 56 to*

*62 RIO system sales*.  MAKOplasty procedure guidance remains unchanged at 11,000 to 13,000 expected procedures in 2012.

106.    In a conference call held the same day, the Individual Defendants took pains to attribute the miss to issues that arose with a few potential buyers whose transactions did not close during the quarter, in a blatant and misleading attempt to dispel any notion that there may have been broader problems undermining RIO system sales.  Defendant Ferré cited: (i) a hospital that had an emergency and had to divert the capital it intended use on the RIO system; (ii) an academic institution account that required additional paperwork to be done; and (iii) a "couple situations" where hospitals sought a reduction in price and the Company refused to oblige.

107.    Despite the dismal sales figures reported for the first quarter and the declining utilization rates, defendant Ferré represented that interest in MAKO products remained strong, that the deals the Company had failed to close were still in MAKO's sales "funnel," and that the "fundamentals still continue to be in place":

[ANALYST]

And just, if I could, before I -- my follow-up here, I just want to make sure I understand you. You said they didn't fall out of your funnel, but they -- did any of them close? Is there any color that you can provide?

[FERRÉ]

I can't provide whether they closed or not closed. But I can tell you that they haven't fallen out of our funnel. And if you ask me, what are the type of reasons? They are typical reasons of why they fell out, some of it was a diversion of capital dollars spent. ***There was a hospital that had an emergency and had to use the dollars that it was going to spend on MAKO.*** Nothing that's atypical. We had ***an academic institution*** that we anticipated was going to close, but they went ***-- additional paperwork had to be done.*** And then we had ***another couple situations where at the end, the hospital wanted to come back with reduction of price and we didn't budge*** on the price. And we decided to move on to it. And I would say that none of these -- once again, ***none of these accounts fell out of the funnel. And from my view, I think the fundamentals still continue to be in place***.

108.    As for MAKO's lowered guidance, defendant Ferré stated that the Company looked to its "sales funnel" and adjusted its closing ratios "based on the prospects and the status of [MAKO's] sales funnel" in setting its forward guidance.  Ferré maintained that the Company closely monitors incoming data "[a]s more data becomes available" and "refine[s] the forecast process to be more accurate."  He also stated that the Company formulated its revised guidance

- 38 -

by adjusting its closing ratios for the "balance of the year."  Ferré reassured wary investors and analysts alike regarding the newly issued guidance, stating that, "we always have given guidance where we feel is a number that we can make":

> [ANALYST]
>
> Oh, great. Hi, guys. Thanks for taking the questions. I would like to start by following on Matt's question, and maybe talking about the change that you made to the guidance for the year on the systems side. So you took the bottom end of that range down by about four systems. Where in the quarter, it looks to me like you came in about two systems below my number, about three systems below the street. But again, brought the lower end down by four systems. Maybe if you could **give us a better sense of how you are coming up with the guidance -- the updated guidance range, the degree of visibility that you feel that you have from here for the next three quarters of the year**?
>
> [FERRÉ]
>
> Okay. So Kim, to give you some perspective, how we set guidance, we always -- **we have always analyzed our sales funnel and assigned certain, what we call closing ratios, based on the prospects and the status of our sales funnel**. We are still relatively early in the commercialization cycle. **As more data becomes available, we always refine the forecast process to be more accurate**. So **based on what happened in Q1, we have adjusted our anticipated closing ratios for the balance of the year, which is why we elected to lower guidance**. Just put another way, **what we do is we look at that closing ratio and we made an adjustment**, and we felt it was appropriate to be where -- **we always have given guidance where we feel is a number that we can make.** So that's why we decided to go forward and change the guidance.

109.   Also during the call, defendant Ferré affirmatively misled shareholders to believe that he had "**personally spent a great deal of time looking and understanding what happened in the quarter, just like [he does] every quarter**," and that there were **no "negative macro trends in [MAKO's] Business**."  According to Ferré, most of the sales were closed earlier in the quarter, and the disappointing sales were attributed to the Company's inability to close deals at the tail end of the quarter.  Ferré again repeated that the deals that the Company failed to close did not fall out of MAKO's "sales funnel" and that the "fundamentals remain strong."  Ferré hinted at, but downplayed, the pricing pressures encountered by the Company, stating "we are selling expensive equipment, innovative technology in a field — in an industry that hasn't seen a lot of innovation. And I think that that kind resulted in sometimes some of the unpredictability in our Business":

[ANALYST]

Good evening.  Thanks for taking our questions. One on the robot number and the slow start. Can you give us some sense maybe of how the quarter went?  Was it slow the whole quarter? Were things maybe kind of bunched up? Any color around the end of the quarter? Is this something where we may see some of these things that you expected to close in the first quarter and the second quarter? Any kind of color like that would be very helpful. And then I have one follow-up.

[FERRÉ]

Okay, Matt. So first, let me say that obviously we were disappointed by the system placements in the quarter. And *I have personally spent a great deal of time looking and understanding what happened in the quarter, just like I do every quarter. So there's nothing inconsistent there. And how -- and really, especially the beginning of the first quarter, I look at this and how it may change our outlook for the year.*

The bottomline is *our analysis did not identify any, what I would call, a negative macro trends in our Business*. And here are various typical reasons on the count by count basis on system sales that didn't occur in the quarter. *It's important to note that none of these accounts fell out of our sales funnel.* I would also say, I believe that *the fundamentals remain strong*, but we are selling expensive equipment, innovative technology in a field -- in an industry that hasn't seen a lot of innovation. And I think that that kind resulted in sometimes some of the unpredictability in our Business.

Specifically, *in terms of visibility*, on issues -- *on annual guidance*, from our fourth -- from our call, our Q4 call -- from system placements perspective, *we had a good start to the first quarter relative to previous first quart quarters*. So we saw some of the systems kind of come in earlier. The difference this time for us was that *at the end of the quarter, we just -- we didn't expect to see as fewer closures as we normally see*.

110.    Analysts questioned defendant Ferré regarding his level of confidence in his statements that many of the yet unclosed deals were still in the "funnel" and that the Company would be able to meet even its revised projections.   Ferré assured investors that he had "*personally … gone through a lot of these deals* and look[ed] at it and *drilled down [to] see where they are*," and he staunchly reiterated that "*the fundamentals are in place*." Ferré also provided further insight into his personal involvement in evaluating the Company's performance and formulating guidance, stating that he "*look[ed] at these systems that are working and hospitals*" and *reviewed these deals "on a deal to deal basis"* to gauge *"the type of interest, the type of level, the stage of where these deals are at*":

[ANALYST]

Hi, good evening. Thank you for taking the question. I just wanted to follow up on the previous question, actually, Maurice. *When you say you are confident that your funnel [Sic] funnel is intact* and the one-third/two-third split is what you've done historically and you remain comfortable for that in this year; *how does level of confidence in the funnel compare to what it was a month ago*?

[FERRÉ]

What we did was, *we changed our closing ratios. So I think that that in itself kind of builds up the probabilities. And I personally have gone through a lot of these deals and look at it and drilled down and see where they are. And I feel that the fundamentals are in place. I don't think that we have -- all of a sudden are going to see something significant -- a significant drop off.* Sometimes it's just very hard to predict.

This is -- if you look at it, to be very candid, this is the first time that we have really kind of missed in our view, in terms of internally, and it's reflective. And so we have got to take -- we've got to kind of regroup and say, *is there anything fundamentally wrong here? And the answer is no . I go back and look at these systems that are working and hospitals and the type of interest, the type of level, the stage of where these deals are at, in terms of we drill down in looking at these deals on a deal to deal basis.* And we just have to make sure that we have enough of them in the funnel. And that we have our guys out there in the street doing their jobs. And we are seeing that.

*I don't think that there's anything that is*, in my view, kind of *alarming* and reflective of what we think. We have been a very predictable company up to this point and we want to continue to be that way, going forward.

111.    Despite expressing supreme confidence in the Company's 2012 full year guidance, defendant Ferré notably remained non-committal about the Company's prospects for the second quarter.  For example, Ferré refused to acknowledge that, according to previous disclosures, one-third of MAKO's guidance would be realized in the first half of 2012, and the Company would have to sell eleven RIO system units in the second quarter to keep pace with the newly revised guidance:

[ANALYST]

Okay. And then just *doing some quick math, in the one-thirds/two-thirds phenomenon on your system placements; it looks like to hit the low end of your guidance range of 52 systems, you would have to do -- you would have to sell 11 systems in the second quarter, which seems like a -- it's down from last year, but it's still a pretty big step up from the first quarter. So how confident are you that*

*you can get to that 11 system number in the next quarter?* I know you are not giving quarterly guidance. But you kind of are with the one-third/two-thirds, I guess, so -- ?

[FERRÉ]

*We don't give quarterly guidance*. But *this is what we trended in past*. And *based on* what we've looked at and *looking at our funnel, that's how we feel*.

112.    The statements made in MAKO's May 7, 2012 press release and conference call were false and misleading because they failed to disclose the full scope and nature of the Company's slowing sales. First, the revised 2012 guidance in the May 7, 2012 press release and during the conference call remained unreasonably bullish and was unsupported by the facts and information within the Individual Defendants' knowledge.    Specifically, the Individual Defendants were still projecting sales growth based, in part, on sales in 2011, despite their knowledge of the following facts: (i) the Company had exhausted its consumer base of early adopters and was entering a new phase in the adoption lifecycle of its RIO system and MAKOplasty procedures, which would require MAKO to demonstrate the value of its product to the early majority of as-yet-unconvinced surgeons in the orthopedic community; (ii) the Company implemented a bottoms-up adoption strategy that imposed significant hurdles to the Company's efforts to grow adoption beyond the early adopters to the early majority; (iii) the Company was facing longer selling cycles due to pricing pressures and demand from hospitals for more clinical data and surgeon support to establish favorable  return on investments; (iv) the Company had insufficient marketing and sales resources to shift industry practices from manual complete knee procedures to the new implant customization procedures that MAKOplasty offered; (v) MAKO was receiving significant negative feedback and pushback from surgeons regarding its newly-launched hip application; and (vi) its utilization figures were skewed and did not support across-the-board adoption of the MAKOplasty platform.

113.    The statements made in MAKO's May 7, 2012 conference call were also misleading because defendant Ferré deceptively understated the pricing pressures facing the Company.  Contrary to their representations that the factors contributing to the quarter miss were merely one-time anomalies, the Individual Defendants (and in particular, defendants Ferré and LaPorte) knew that MAKO faced deeper substantive issues (discussed above) arising from its transition from the early adopter phase to the early majority phase of the adoption cycle,

including longer selling cycles for the "early majority" customers and pricing pressures as a result of customers' reluctance to pay the high prices for the RIO system without further assurances that their return on investment would make the purchase worthwhile.  Indeed, the Individual Defendants carefully scrutinized and closely monitored each RIO system sale and the information about the key factors influencing RIO system and implant sales, including hospital and health care providers' evaluations of the RIO system's return on investment, price resistance, and physician adoption rates.  The Individual Defendants also knew that the shift from early adopters to the early majority users they would need to persuade to make their guidance would be compounded by their unorthodox bottoms-up marketing strategy, inadequate marketing and sales resources, and the notorious inefficiencies in its newly-launched hip application, all of which, if not remediated, would cause recurring problems for the Company's sales.  Accordingly, the Individual Defendants had no basis to assure investors that there were no negative fundamental trends that would undermine their sales forecast.

114.    Securities analysts who conducted their own channel checks and understood some of the underlying trends openly questioned MAKO management's credibility.  For example, in an article titled "MAKO shares plunge on weak results, outlook," *Reuters.com* reported:

> **Mako now expects to sell 52 to 58 RIO systems** -- a robotic-arm interactive system used for minimally invasive knee procedures -- during the full year. **It had previously forecast sales of 56 to 62 RIO systems**.
>
> **"While management reduced its guidance by a small amount, we are concerned that it remains too high and see a risk of further misses and/or guidance reductions," Mizuho Securities analyst Michael Matson wrote, downgrading the stock to "neutral" from "buy"**.
>
> Echoing Matson's view, William Blair & Co analyst Matthew O'Brien said the revised outlook range requires a strong performance from Mako during the remainder of the year, which may prove challenging as the sales cycle appears to be showing only modest improvement.
>
> **Matson downgraded Mako shares to "market perform" from "outperform"**.
>
> **Mako shares, which have gained 44 percent since the company gave an upbeat outlook for 2012 in January, fell 33 percent to $27.89 on Tuesday on the Nasdaq**.

115.    On June 5, 2012, defendant Ferré participated in a conference call in connection with the Goldman Sachs Global Healthcare Conference.  During the call, Ferré reaffirmed the Company's revised guidance and shed further light on the process the Company undertook in

reaching its lowered guidance.  Ferré responded to analysts' questions by misleadingly claiming that MAKO was being more "conservative" with its closing ratios and that his personal evaluation of each sale, the sales "funnel in terms of interest level[,]" and the "hospitals that are doing procedures" supported the revised sales forecast.  He did not acknowledge any of the underlying issues that were materially undermining RIO sales.  Ferré firmly maintained that he was confident in the revised, lowered guidance numbers.

[ANALYST]

So if I think about your comment that you manage to an annual number, **you took down the midpoint of guidance by basically the miss in the quarter. You also commented on the call that your business is sort of one-third, two-thirds mix first half versus second half. So you have implicitly given the second quarter guidance at the midpoint of the range to hit 11 systems. So how confident are you in that number?**

[FERRÉ]

So, **yes we did**. We kind of – we talked about, historically, we see our business as being one-third, two-third. That's what we've seen since our inception. **Most of our businesses has been back loaded**. **The reason we took guidance down was we wanted to be – we wanted to make sure from our perspective that we don't see the types of things that happen in Q1 occur again.**

**So what we did was we looked at the – at our closing ratios and looking at Q2, Q3 and Q4 and then we looked at those ratios and we wanted to be a little more conservative in terms of what that ratio should look like. And that turned out to be four systems. So that led us to kind of lower that guidance by four systems.** So now we're 52 to 58 versus 58 to 62. And **how good do I feel about that? I feel like the fundamentals of our business are intact**. I think that we look at our funnel in terms of the interest level. We look at the hospitals that are doing procedures.

We look at interest levels across the board, which are up in terms of the number of what we look at in our funnel. We think it's – we see that – we've seen a significant increase in those numbers. So from our perspective, we think that the fundamentals are in place to make the numbers.

\* \* \*

- 44 -

[ANALYST]

I got you. But just to be clear that the – you are saying that *you're confident in the guidance that you've given and in the split of first half, second half, you communicated on May 5.*

[FERRÉ]

*Yes, yes.*

116.     Defendant Ferré's statements in the June 5, 2012 Goldman Sachs conference call, were improper and misleading. In particular, the revised and lowered 2012 guidance reaffirmed by Ferré was still too bullish, was not "conservative" in any way, and lacked any reasonable basis in fact.  Ferré knew the following adverse facts (provided in further detail below in Section VI) that undermined any possibility that the Company would achieve year-over-year sales growth projected by its 2012 guidance, let alone match 2011 sales: (i) the Company had exhausted its consumer base of early adopters and was entering a new phase in the adoption lifecycle of its RIO system and MAKOplasty procedures, which would require MAKO to demonstrate the value of its product to the early majority of as-yet-unconvinced surgeons in the orthopedic community; (ii) the Company implemented a bottoms-up adoption strategy that imposed significant hurdles to the Company's efforts to grow adoption beyond the early adopters to the early majority; (iii) the Company was facing longer selling cycles due to pricing pressures and demand from hospitals for more clinical data and surgeon support to establish favorable return on investments; (iv) the Company had insufficient marketing and sales resources to shift industry practices from manual complete knee procedures to the new implant customization procedures that MAKOplasty offered; (v) MAKO was receiving significant negative feedback and pushback from surgeons regarding its newly-launched hip application; and (vi) its utilization figures were skewed and did not support across-the-board adoption of MAKOplasty platform. None of the above adverse facts was disclosed to investors during the call.  As described *supra* in Section VI, the Individual Defendants, and in particular Ferré, were intimately familiar with these adverse facts because RIO system sales and associated MAKOplasty procedures represented the Company's core operations and the single-most important metrics driving revenue.  Indeed, every deal was closely scrutinized, every relevant piece of information was digested, and MAKO's RIO system sales force was closely monitored by the Individual Defendants to assess the Company's business prospects for volume sales of its RIO system.

117.    As discussed below, the Company would be forced to further lower its guidance to below 2011 sales figures approximately just one month later.

## IX.    THE FULL EXTENT OF THE INDIVIDUAL DEFENDANTS' MISLEADING GUIDANCE IS REVEALED

118.    The Individual Defendants were finally forced to disclose the true facts concerning the facts underlying the reality that MAKO's sales were materially slowing, not rising, as the Individual Defendants had told shareholders.   Despite expressing unbridled confidence in the Company's revised guidance during the Goldman Sachs conference call just one month prior, in a July 9, 2012, a press release announcing selected operating results for the second fiscal quarter 2012 financial results, the Individual Defendants reported MAKO's second consecutive quarter of disappointing RIO system sales.   The Company announced that it had sold only nine RIO systems–two short of the pace necessary to achieve even their materially lowered guidance:

> RIO Systems — Nine RIO systems were sold during the second quarter, of which eight were sold to domestic customers and one was sold to a distributor in China, which in turn was sold for commercial use to a prominent hospital in Hong Kong. The average selling price for RIO systems was in line with the prior quarter. These nine RIO systems bring MAKO's worldwide commercial installed base of RIO systems to 126 systems and domestic commercial installed base to 123 systems as of June 30, 2012.

119.    The Company further shocked investors by lowering both 2012 sales guidance for the second time in less than three months, and reducing guidance for the number of MAKOplasty procedures:

> ***Based on the slower than expected start during the first six months of the year, MAKO now anticipates selling 42 to 48 RIO systems in 2012, which compares to prior guidance of 52 to 58 RIO system sales***. Additionally, as a result of adjusted guidance for 2012 RIO sales, ***MAKO is narrowing 2012 MAKOplasty annual procedure guidance to 11,000 to 12,000, which compares to prior guidance of 11,000 to 13,000 procedures***.

> "With six months of 2012 behind us, we have experienced slower than expected growth," said Maurice R. Ferré, M.D., President and Chief Executive Officer of MAKO."   While our core belief in the significant market opportunity and the transformational value of our technology remains intact, ***management's near term focus will be to improve our execution for the remainder of 2012 and beyond***."

120.    That same day, MAKO hosted an earnings conference call, during which defendants Ferré and LaPorte attempted to explain how MAKO could have missed even their materially reduced "conservative" guidance.  Ferré was forced to disclose what the Individual Defendants had known all along: the shift from early adopters to early majority would significantly hinder the Company's ability to grow sales at anywhere near the levels forecasted in its initial 2012 guidance.  Although Ferré tried his best not to admit that these trends portended slower sales, he was compelled to acknowledged that hospitals lacked the sufficient support of surgeons and medical personnel for MAKOplasty to justify the significant cost commitment and ensure favorable return on investment:

> The second quarter continued some of the trends we saw in the first quarter. Most notably, *the results of our RIO sales for Q2 were below our expectations*. As we have discussed previously, in our experience, RIO system sales are typically back-end loaded in any given quarter. As the quarter came to a close, some sales were reasonably expected, would close in the quarter did not. Hospital interest in our technology remained strong, as reflected in a healthy number of qualified accounts in our sales funnel. *However, our analysis suggests that as we approach the shift from early adopter phase to early majority phase of the technology adoption life cycle, we are finding that a growing number of potential purchasers require buy-in from a larger number of surgeons to support the return on investment of a MAKOplasty program*. Surgeon's interest in MAKOplasty also remains high, as we believe it will continue to grow. We see an increasing attendance at our regularly conducted regional BioSkills training labs, which requires a meaningful surgeon time commitment as a leading indicator of the future use of the RIO.
>
> *   *   *
>
> In summary, from these limited second quarter results, we believe it is fair to conclude two things. First, as indicated by our procedure volume and utilization, MAKO's existing customer base remains engaged, which would suggest that the fundamentals of our business are intact. *Second, MAKO's prospective customer base has raised the bar with respect to what is required to commit to investing in a MAKOplasty program.* We believe we can meet their requirements by demonstrating in the sales cycle, both the strong economic case and the compelling clinical value proposition.

121.    Defendant Ferré also admitted that the Company had monitored and reviewed sales data throughout the quarter and learned that hospitals were requiring "more data to support their [return on investment]."  Indeed, Ferré confirmed what the Individual Defendants had known since at least the beginning of 2012: hospitals were requiring more "surgeon support,"

that build on "their [return on investment]," and that this was leading to a longer "selling cycle" and slowing sales:

> [FERRÉ]
>
> …And what we specifically did was, *as we normally do, throughout the quarter, and throughout the end of our cycle, we look at the data*. And we asked ourselves specifically, do we -- *looking at specifically at the deals* that were in play, *that did not* come into play or *close at the end*. And *what we saw conclusively, was that we saw that these deals were requiring hospitals, specifically looking for more data, more data to support their ROI.*
>
> Now why, why is that happening? *Is that something that is a new trend in capital sales? I don't know. But I know that specifically, in the deals that we were trying to close, that we saw a prolonged cycle*. And to me, the leads that we saw, to be very clear, *these were very qualified deals. And what we see as a trend, is that the hospitals are doing more due diligence. And what we are also seeing, it's a trend also with the hospital cycle*. It is not atypical for the hospital CEO to say, yes, but then you got to go through another layer of administrators that are asking for a new set of questions. And I think that process is just taking a longer than anticipated. And that is our observation. So taking that -- this analytic approach, *we see that the hospitals are focused more on ROI* than we have seen in the past. And I think we are kind of seeing this, as a -- as *hospitals becoming* probably, *I would say more risk adverse on their purchasing*.
>
> \* \* \*
>
> *I think the operative key that we are seeing is that hospitals want to see more surgeons support, that builds on their ROIs*. I think that is what we are seeing, where we have to get more doctors engaged.
>
> \* \* \*
>
> I think it is all about more docs to close, with the same information. Period. It is not that we need more convincing data, that *the hospitals are looking for more doctors to be part of the MAKOplasty program*. And what our job -- and this is based on looking at the analysis of the deals that were prolonged this quarter. And I think that is a reflection of what we believe needs to happen.
>
> \* \* \*
>
> *I think it is more docs that reduce risk to the hospital administrator, about the building a strong ROI for the system*.

122.    The second quarter miss was even more egregious given defendant Ferré's insistence that he personally "went to every individual sales person in [the] Company" after the first quarter miss and that there was "a lot of visibility" into all deals leading up to the second

quarter results.  In fact, Ferré candidly disclosed that he himself made "personal site visits" to hospitals and met with "hospital administrators," and that there was "a lot of visibility on these deals" given that the deals "take a while to develop."  Nevertheless, Ferré did not, because he could not, explain how or why he and the rest of the Individual Defendants failed to disclose or take necessary action in light of the longer selling cycles and the fact that these hospitals were requiring more surgeon support and data to justify their return on investment:

> [ANALYST]

> Good evening. Thanks for taking the question. Maurice, *I was just curious about your commentary on the longer selling cycle. To get to the midpoint of the new range now, we are going to need 30 systems in the back half of the year. But you are saying that the selling cycle is more challenging than it has been in the past. You don't have HMA in there this year, and I think you placed quite a few in the back half of last year. How can you have some good visibility, or just a strong confidence in the ability to get to that 30 number during the second half of the year?*

> \*   \*   \*

> Okay. So in total 29 systems, and then 24 ex- HMA. *So you are expecting to go up, roughly 20% in a more difficult environment? I am just trying to get a sense for your confidence.* And I understand that you have a new application in there to sell to folks. *But just, where do you get that comfort level, that you can get to 30?*

> [FERRÉ]

> And I think to be fair about it, I mean, look, we have got through this now. And we continue to go through the information that we have at hand, and as managers it is our job to kind of understand the data, and to be able to react to it in a way that is meaningful and predictable. I mean, that is our goal. And I think, just consistently, we have performed a detailed, bottoms up analysis on our funnel, and it is something that I will always do. And it is not that this is not something new, but it is something that this time around, after missing by those 2 systems at the end of the quarter, *I went to every individual sales person in our Company. And I sat down with my team, and we went through with a lot of rigor, and trying to understand exactly where we are, and what the implications are for Q3 and for Q4. And I will tell you, anybody who is involved in capital sales, knows that there is a lot of visibility on these deals. These deals take a while to develop. It is not overnight. There is a lot that goes into these deals. There are site visits by hospitals, by hospital administrators There is personal site visits, that me and my team do, to make sure that we build out these practices.  There is the Bioskill labs. So there is a lot of visibility.*

And we first, in the first quarter we looked at this, and we change those ratios. And I think that what we did this time around, because obviously this does not take -- we did not just lower it by 2. We basically said, look, let's be -- let's make sure that with the information that we have, like we always do, is let's take this information, and make sure that we have got it right. And I think this is the best information that we have. And we have taken this approach that we feel confident that these are the right numbers to project. ***I think it reflects some of what we have learned about the bulk buy from HMA.*** I think that is fair, to kind of put that in there. But I think it takes more into consideration, how we continue to evaluate our opportunities from a bottoms-up analysis during this process.

123.    Finally, the Individual Defendants' intimate knowledge of the inner-working of MAKO's operations, products, sales, and challenges is further underscored by their extensive history with the Company.  In fact, the majority of the Individual Defendants, and seven of the eight current directors, has been with MAKO since either its inception in November 2004 or essentially from the time the Company went public in February 2008.  As such, the Individual Defendants were more than just familiar with the Company's core business, they had helped build it from the ground-up, and ushered its entry into the public market.  Because they were instrumental in shaping the Company, these Individual Defendants were knowledgeable as to every aspect of the Company's business, including the factors taken into consideration in formulating the all-important RIO sales projections, and keen to the fact that the Company was facing immense challenges as it entered into a new phase of the adoption cycle.

124.    As expected, analysts and investors alike reacted negatively to the news.  On July 10, 2012, the day after these disclosures, MAKO stock dropped $10.60 per share, or approximately 43%, in a single day on high volume trading. The $10.60 stock decline was the single biggest drop since the Company's shares began trading in February 2008.

125.    The Individual Defendants' failure to speak honestly with analysts and shareholders severely damaged MAKO's credibility in the capital markets.  In a July 10, 2012 reported, entitled, "MAKO Miss – Take Two,"   Summer Street Research Partners lowered MAKO stock ratings from a "Buy" to "Neutral," expressing concern over managements inability "to come to grips with the issues that have plagued placements over the past two quarters":

MAKO preannounced poor 2Q12 sales yesterday. ***The issues that persisted in the first quarter continue. MAKO released poor second quarter placements of nine RIO robots***, coming in below our estimate of 12 placements and the consensus

expectation of 11 RIO robot placements. Eight were placed domestically and one was placed in China. ***This is another misstep for management, as RIO placement is the single metric investors focus on, and it is no surprise that MAKO's market cap was slashed by 38% in aftermarket selling***. *A conversation with management did not leave us with any confidence that guidance for the remaining part of the year is achievable, given their comment that they have yet to come to grips with the issues that have plagued placements over the past two quarters*.

126.    The Summer Street Research Partners report rejected the Individual Defendants' assurances that there were no fundamental problems, reporting that there were "more questions [that] are being raised about MAKO's clinical added value, especially in hips and how to best incorporate RIO system into a surgical practice." Based on its consultations with Medical Consulting Research Inc.,  Summer Street identified several issues that undermined the Company's previously forecasted figures for the RIO system sales including: ***(i) "lengthening sales cycle[s]"; (ii) "lack of clear outcomes data, especially in hips"; (iii) "lack of comfort/experience/data with MAKO hip system"; (iv) "high upfront cost" and "potential for cheaper alternatives."***  Summer Street concluded that ***the issues encumbering the RIO system outweighed "the added value that was initially seen in the partial knee experience, which drove the early adopters to get on board."***  As the Individual Defendants knew from their own frequent interactions with healthcare providers and hospitals, the pace of sales to the early majority adopters in 2012 would not approach the pace of sales to early adopters in 2011.

127.    That same day, Goldman Sachs & Co. lowered its rating of MAKO from a "Buy" to "Neutral," commenting: "Given slowing growth over the past two quarters, ***we are starting to question the long-term viability of MAKO's core technology and the extent to which the company can grow outside of its initial indication.*** Simply put, we were too bullish about the ramp in total hips and the company's ability to sell systems outside of large contract orders."

128.    Canaccord Genuity followed suit, dropping its price target on MAKO's stock from $29 to $16.  As discussed above, Canaccord Genuity had consistently raised serious questions about MAKO's earnings projections and future business prospects, including: (i) a January 9, 2012 analyst report, that noted that ***MAKO's bottoms-up sales growth strategy "could significantly limit penetration into the market"*** and that the Company's utilization rates may have appeared better than they actually were because there "could be ***a high concentration of high volume surgeons boosting these figures";*** and (ii) a January 26, 2012 report, that noted

that ***MAKO "do[es] not have the sales and marketing power to change the current practices in orthopedics overnight."***

129.     The Company's second straight quarter of guidance misses was further criticized in a July 10, 2012 JP Morgan report entitled "The Other Shoe Has Dropped; 2Q Misses and Guidance Comes Down Again."   JP Morgan stressed that ***these longer selling cycles that (among other things) caused MAKO's guidance misses were not unprecedented or unforeseen, but rather were "a natural progression as MAKO works beyond accounts that represented lower hanging fruit***":

> **What Happened?** At the midpoint, ***Mako has lowered its system guidance range by 24% since January***. We think this is a function of two things: (1) ***the sales cycle has become more complex***; and (2) ***under-estimation of the one time nature of HMA purchases in 2011***. ***HMA purchased 13 systems in 2011, including 11 under a bulk order contract***, and while these were systems that were already in the sales funnel, there was likely a pull-forward of business that would otherwise have come over the course of 2011-2013. Mako also indicated that in 2Q it saw a longer sales cycle, with hospitals wanting broader physician buy-in before committing to a purchase. ***This is a function of today's hospital environment, but also seems like a natural progression as MAKO works beyond accounts that represented lower hanging fruit.***

130.     In a July 10, 2012 *Bloomberg* article entitled "Mako Surgical Falls Most Ever After Cutting Device Forecast," Michael Matson, an analyst for Mizuho Securities USA, explained that he had ***reduced his rating on MAKO stock to neutral, pointing to "an issue of management credibility*** and of growth."   Matson proffered the consecutive quarter misses demonstrated that "growth is not as strong as people had thought," and worse, "***demand is just not at the level that people thought***."

131.     The same day, a separate article published by *Reuters* entitled "Mako Shares Plunge on Sales View of its Surgical Robot," quoted Michael Matson as stating: "It appears that ***MAKOplasty adoption has slowed*** and that ***MAKO is struggling to gain traction beyond its initial early adopter customers***."

132.     The ensuing fallout from the Company's disappointing first and second quarter misses was not limited to simple disbelief and disappointment from investors and analysts.  The stunning July 9, 2012 disclosures, were followed by internal housecleaning among the management and director-level ranks, underscoring the depths of the problems facing MAKO.

133.     Unsurprisingly, the internal shake-up began with the Company's sales and marketing sector.  On July 18, 2012, MAKO announced the resignation of Steven J. Nunes, the Company's Senior Vice President of Sales & Marketing.  In a move that evidenced the deep-rooted structural issues within the Company's sales and marketing departments, MAKO further announced that it would split the roles of marketing and sales into two positions – a Senior Vice President of Sales and a Senior Vice President of Marketing.  The Company also announced that, in line with his already hands-on role with the Company's sales, defendant Ferré would assume sales responsibilities in the interim, pending the search for a new Senior Vice President of Sales.

134.     MAKO further announced that on July 19, 2012, defendant Savarese tendered his resignation as a director of the Company following the divesture by Montreux Equity Partners, a fund that was affiliated with Savarese.

135.     Then, on August 1, 2012, MAKO issued its complete results for the second quarter of 2012.  The press release largely reaffirmed the disappointing sales figures and reiterated the lowered guidance already disclosed in the Company's July 9, 2012 selected operating results.  However, the press release revealed a 48% increase in the Company's unsold inventory, further underscoring the slowing sales of the RIO system and associated MAKOplasty products.

136.     In the earnings conference call held the same day, defendant Ferré again attributed the dismal results and slowing sales to the hospital administrators who were "performing more extensive business case analysis and are requiring support for more surgeons prior to purchasing a system."  Acknowledging the underlying trend towards slowing sales, Ferré emphasized that the Company was "investing in sales force training" and working to improve the "sales and marketing analytic tools" to drive up utilization in new and existing accounts. Ferré also implicitly acknowledged the difficulties in demonstrating return on investment to hospitals staffed by non-early adopters, unveiling the Company's plans to improve "surgeon efficiency" by releasing new software for both knee and hip procedures that would "speed[] up the registration process and generally improve[] ease of use."

## X.     DAMAGES TO MAKO

137.     As a result of the Individual Defendants' improprieties, MAKO disseminated improper public statements concerning the Company's business prospects.  These improper statements have devastated MAKO's credibility in the capital markets, as reflected by the

Company's over $1.3 billion, or approximately 68.7%, decline in market capitalization from a stock price high of $44.98 during the relevant time period.

138.   Further, as a direct and proximate result of the Individual Defendants' actions, MAKO has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to, costs incurred and to be incurred:

(a)   investigating and defending MAKO and certain officers and directors in the Securities Class Action;

(b)   paying any potential settlement or adverse judgment in the Securities Class Action; and

(c)   paying compensation and benefits to the Individual Defendants who have breached their duties to MAKO.

139.   Moreover, these actions have irreparably damaged MAKO's corporate image and goodwill.   For at least the foreseeable future, MAKO will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that MAKO's ability to raise equity capital or debt on favorable terms in the future is now impaired.   In effect, the Company stands to incur higher marginal costs of capital because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

## XI.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

140.   Plaintiff brings this action derivatively in the right and for the benefit of MAKO to redress injuries suffered, and to be suffered, by MAKO as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   MAKO is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

141.   Plaintiff will adequately and fairly represent the interests of MAKO in enforcing and prosecuting its rights.

142.   Plaintiff is a shareholder of MAKO at the time of the wrongdoing complained of, and has continuously been a shareholder since that time, and remains a MAKO shareholder today.

143.    MAKO's Board consists of the following eight individuals: defendants Ferré, Blumenfeld, Dewey, Federico, Moll, Freund, Pettingill, and Pruitt.  Plaintiff did not make any demand on the Board to institute this action because such a demand is futile, wasteful, and useless, as set forth below.

**A.    Demand Is Excused as to CEO/Inside Director Ferré Because He Is Not Disinterested and Independent and Because He Faces a Substantial Likelihood of Liability**

144.    Defendant Ferré's primary and principal occupation is his job as MAKO's CEO, and it has been since he founded the Company in November 2004.  He has earned and continues to earn his living as a result of his employment at MAKO.  Indeed, he made more than $4.2 million in 2011 alone.  Given the substantial income Ferré derives as a result of his employment at MAKO, there is reason to doubt his disinterestedness and ability to impartially decide whether to take action against his fellow directors, as doing so could jeopardize his livelihood.  In fact, MAKO has admitted in its public SEC filings that Ferré is not independent.  Specifically, the Company's Proxy Statement, filed with the SEC on April 27, 2012, states that the MAKO Board has determined that Ferré is not an independent director "under the independence standards of The NASDAQ Global Select Market."  Because Ferré is neither disinterested nor independent, demand on him is futile.

145.    In addition, demand is futile as to defendant Ferré because he faces a substantial likelihood of liability for his breaches of fiduciary duties owed to MAKO.   As the Company's President, CEO, and Chairman of the Board, Ferré had a duty to disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.  Ferré, however, well knew (or at the very least recklessly failed to know in conscious disregard of his duties) that his repeated statements touting the Company's RIO system sales prospects were misleading because there was no reasonable basis to support the Company's 2012 guidance.

146.    In particular, defendant Ferré knew or recklessly failed to know that: (i) the Company had exhausted its consumer base of early adopters and was entering a new phase in the adoption lifecycle of its RIO system and MAKOplasty procedures, which would require MAKO to demonstrate the value of its product to the early majority of yet unconvinced surgeons in the orthopedic community; (ii) the Company implemented a bottoms-up adoption strategy that

imposed significant hurdles to the Company's efforts to grow adoption beyond the early adopters to the early majority; (iii) the Company was facing longer selling cycles due to pricing pressures and demand from hospitals for more clinical data and surgeon support to establish favorable return on investments; (iv) the Company had insufficient marketing and sales resources to shift industry practices from manual complete knee procedures, to the new implant customization procedures that MAKOplasty offered; (v) MAKO was receiving significant negative feedback and pushback from surgeons regarding its newly-launched hip application; and (vi) its utilization figures were skewed and did not support across-the-board adoption of MAKOplasty platform.

147.    Defendant Ferré knew these adverse facts because, as he freely admits and as his position dictates, he was directly responsible for every aspect of the Company's core operations, including growing sales and adoption of the RIO system and its MAKOplasty procedures and setting related earnings guidance to be provided to investors.  In furtherance of this objective, Ferré was actively involved in evaluating data reflecting the progress of ongoing deals, setting the closing ratio for theses prospects, and then using the cumulative information to formulate the Company's guidance for RIO system sales.  Indeed, Ferré was so entrenched in the Company's business that he made "personal site visits" to hospitals and met with "hospital administrators," and  went "to every individual sales person in [the] Company" to discuss the Company's missed sales projections after the first quarter of 2012.

148.    Nevertheless, as detailed above in Section VIII A.-B., defendant Ferré misled investors in the Company's press releases and conference calls regarding the Company's business prospects for sales of its RIO system in 2012.  Ferré breached his duty of care and his duty of loyalty by disseminating improper 2012 guidance that he knew lacked any reasonable basis in fact when made. Ferré, thus, faces a substantial likelihood of liability, which renders demand upon him futile.

**B.     Demand Is Futile as to Audit Committee Defendants Dewey, Pettingill, and Pruitt (Together with Ferré, a Majority of the Board) Because They Face a Substantial Likelihood of Liability**

149.    Demand on the Audit Committee Defendants (defendants Dewey, Pettingill, and Pruitt) is futile because they face a substantial likelihood of liability.  As members of the Audit Committee, these defendants were explicitly tasked with "[r]eview[ing] and discuss[ing] any earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies prior to their publication."  These defendants also had a duty to

ensure that the Company's public disclosures were full, fair, and accurate, and to "[e]xercise oversight over management's performance of its responsibility for the preparation, presentation, and integrity of the Company's financial statements."

150.    The Audit Committee Defendants knew (or in conscious disregard of their duties failed to know) that the Company's sales projections and false assurances were highly misleading.  The Audit Committee Defendants were aware of the adverse facts (described above) due to, among other things: (i) their duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed system units; and (iv) the materiality of every single RIO system sale to the Company's projections and profitability.  The Audit Committee's duties described above necessarily required the Audit Committee Defendants to review all reasonably available information and to ensure that there were adequate bases in fact to support the Company's 2012 earnings projections.  The Audit Committee Defendants monitored MAKO's operations and kept abreast of material concerns arising from MAKO's core operations, each RIO system sale, and associated implant sales, as these were the critical drivers of the Company's operational performance and profitability and formed the basis of the Company's published sales and earnings guidance.  Indeed, the Audit Committee Defendants scrutinized each and every deal because of the significance of even just one deal to the Company's quarterly results and made certain that they had "visibility on these deals."

151.    Notwithstanding the above, and in direct contravention of their prescribed duties, the Audit Committee Defendants knowingly or recklessly breached their duty of loyalty by reviewing and approving improper statements concerning the Company's business prospects. The Audit Committee Defendants also breached their fiduciary duty of loyalty by allowing their fellow defendants to cause, or by themselves causing, MAKO to fail to ensure the accuracy of the Company's disclosures regarding the nature of the Company's business prospects. Accordingly defendants Dewey, Pettingill, and Pruitt face a substantial likelihood of liability, and any demand upon them is, therefore, futile.

### C. Demand Is Futile as to the Entire Board Because All Eight Defendant Directors Face a Substantial Likelihood of Liability

152. Demand on the entire Board is futile because all of the defendant directors face a substantial likelihood of liability for allowing the Company to issue misleading statements concerning the sale of MAKO's RIO system. Specifically, these defendants breached their duty of care and loyalty by tacitly authorizing both the initial and later revised 2012 guidance for RIO system sales that lacked any reasonable basis in fact.

153. Defendants Ferré, Blumenfeld, Dewey, Federico, Moll, Freund, Pettingill, and Pruitt as members of MAKO's Board, had a duty to ensure that the Company's public disclosures were full, fair, and accurate. In particular, these defendants had a responsibility to reasonably apprise themselves of the requisite information to satisfy themselves that the Company was not misleading its investors about its single most important financial metric – RIO system sales.

154. Defendants Ferré, Blumenfeld, Dewey, Federico, Moll, Freund, Pettingill, and Pruitt knew (or in conscious disregard of their duties failed to know) that the Company's sales projections and false assurances were highly misleading. These defendant directors were aware of the adverse facts (described above) due to, among other things: (i) their duties to oversee and ensure the integrity and accuracy of MAKO's public disclosures and guidance and the Company's core business operations and key strategic initiatives; (ii) the fact that RIO system sales and MAKOplasty procedures comprised the entirety of the Company's business; (iii) the small scale of MAKO's workforce and operations; (iv) the small number of installed system units; and (v) the materiality of every single RIO system sale to the Company's projections and profitability. Indeed, Ferré, Blumenfeld, Dewey, Federico, Moll, Freund, Pettingill, and Pruitt scrutinized each and every deal because of the significance of even just one deal to the Company's quarterly results and admittedly had "visibility on these deals."

155. However, in violation of their duties as stewards of the Company, defendants Ferré, Blumenfeld, Dewey, Federico, Moll, Freund, Pettingill, and Pruitt tacitly authorized the dissemination of misleading projections regarding the Company's sales of its core product – the Rio system. These defendant directors were well-aware, or at least in conscious disregard of their duties failed to apprise themselves of, the slew of adverse information concerning the Company short-term sales prospects for the RIO system in 2012. As such, Ferré, Blumenfeld, Dewey, Federico, Moll, Freund, Pettingill, and Pruitt face a substantial likelihood of liability for

allowing the Company to issue misleading statements in violation of their fiduciary duties, and any demand upon the Board is, thus, futile.

### D.   Additional Reasons Why Demand Is Futile

156.   MAKO has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for MAKO any part of the damages MAKO suffered and will suffer thereby.

157.   If MAKO's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Consolidated Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of MAKO.   However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by MAKO against these defendants, known as the "insured versus insured exclusion."   As a result, if these directors were to cause MAKO to sue themselves or certain of the officers of MAKO, there would be no directors and officers' insurance protection and, thus, this is a further reason why they will not bring such a suit.   On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.   If there is no directors and officers' liability insurance, then the current directors will not cause MAKO to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

158.   Finally, despite having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recovery for MAKO for any of the wrongdoing alleged by Plaintiff herein.   There is no evidence that the Board even subjected any of the Individual Defendants to disciplinary action, as required by the Company's own Code.

### COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

159.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    The Individual Defendants owed and owe MAKO fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe MAKO the highest obligation of good faith, fair dealing, loyalty, and due care.

161.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within MAKO and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

162.    The Officer Defendants — Ferré and LaPorte — knowingly made, or acted in conscious disregard of their duties or were grossly negligent in making, improper statements that misled investors as to the true financial health of the Company and the business prospects for sales of its products.  The Officer Defendants breached their duty of loyalty by issuing guidance for RIO system sales that lacked a reasonable basis in fact when made and by concealing adverse facts concerning the Company's slowing sales of the RIO system.  Accordingly, these Officer Defendants breached their fiduciary duties of loyalty and care.

163.    Director Defendants Ferré, Blumenfeld, Dewey, Federico, Freund, Moll, Pettingill, Pruitt, and Savarese, as directors of the Company, owed MAKO the highest duty of loyalty.  The Director Defendants breached their duty of loyalty by knowingly, or in conscious disregard of their duties, allowing defendants to cause, or by themselves causing, the Company to issue improper statements that misled investors as to the true financial health of the Company and the business prospects for sales of its products.  These defendants tacitly authorized the Company's 2012 guidance for RIO system sales that lacked a reasonable basis when made and allowed the Company to conceal the true adverse facts concerning the slowing sales of the MAKOplasty platform.  Accordingly, the Director Defendants breached their fiduciary duty of loyalty.

164.    The Audit Committee Defendants — Dewey, Pettingill, and Pruitt — breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit Committee and which they knew (or in conscious disregard of their duties failed to know) contained improper statements and omissions.  The Audit Committee Defendants utterly failed to fulfill their prescribed duties to review and approve earnings press releases and to ensure that those earnings releases (including financial information contained

therein), all earnings guidance provided to analysts and rating agencies prior to publication, and the Company's public disclosures in general were full, fair, truthful, and accurate.

165.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MAKO has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

166.    Plaintiff, on behalf of MAKO, has no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants for Waste of Corporate Assets**

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    As a result of the Individual Defendants' improper statements in the Company's press releases and conference calls, and their utter failure to ensure that MAKO's public statements and earnings guidance were accurate, MAKO is now a defendant in the Securities Class Action.  The Individual Defendants have caused MAKO to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to the potential ensuing costs from a potential settlement or adverse judgment.  Further, the Individual Defendants have caused MAKO to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

169.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

170.    Plaintiff, on behalf of MAKO, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

171.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense and to the detriment of MAKO.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to MAKO.

173.    Plaintiff, as a shareholder and representative of MAKO, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

174.    Plaintiff, on behalf of MAKO, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of MAKO, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing MAKO to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MAKO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen the Company's disclosure controls and procedures;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

3.    a provision to permit the shareholders of MAKO to nominate at least three candidates for election to the Board;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of MAKO has an effective remedy;

D.    Awarding to MAKO restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  September 27, 2012                    Respectfully submitted,
        Boca Raton, Florida


                                             /s/ Eric Lee
                                             ERIC LEE (Bar No. 961299)
                                             LEE & AMTZIS, P.L.
                                             550 Glades Road, Suite 401
                                             Boca Raton, FL 33431
                                             Telephone:  (561) 981-9988
                                             Facsimile:  (561) 981-9980
                                             Email:  lee@leeamlaw.com

                                             *Liaison Counsel for Plaintiff*

                                             ROBBINS UMEDA LLP
                                             BRIAN J. ROBBINS
                                             CRAIG W. SMITH (admitted *pro hac vice*)
                                             SHANE P. SANDERS (admitted *pro hac vice*)
                                             GINA STASSI (admitted *pro hac vice*)
                                             KEVIN S. KIM (admitted *pro hac vice*)
                                             600 B Street, Suite 1900
                                             San Diego, CA 92101
                                             Telephone:  (619) 525-3990
                                             Facsimile:  (619) 525-3991
                                             Email:  brobbins@robbinsumeda.com
                                             csmith@robbinsumeda.com
                                             ssanders@robbinsumeda.com
                                             gstassi@robbinsumeda.com
                                             kkim@robbinsumeda.com

                                             *Lead Counsel for Plaintiff*

                                             RYAN & MANISKAS, LLP
                                             RICHARD A. MANISKAS
                                             995 Old Eagle School Road, Suite 311
                                             Wayne, PA 19087
                                             Telephone: (484) 588-5516
                                             Facsimile: (484) 450-2582
                                             Email:  rmaniskas@rmclasslaw.com

                                             *Counsel for Plaintiff Todd Deehl*

766164_1

- 63 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 27, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel identified below via transmission of Notice of Electronic Filing generated by CMECF as designated below.

By: <u>/s/ Eric Lee</u>
ERIC LEE (Bar No. 961299)

Eric Lee (CM/ECF)
**LEE & AMTZIS, P.L.**
5550 Glades Road, Suite 401
Boca Raton, FL 33431

Richard A. Maniskas (CM/ECF)
**RYAN & MANISKAS, LLP**
995 Old Eagle School Road, Suite 311
Wayne, PA 19087

*Counsel for Plaintiff Todd Deehl*

Louise Mcalpin (CM/ECF)
Stephen Patrick WARREN (CM/ECF)
Tracy Ann Nichols (CM/ECF)
**HOLLAND & KNIGHT**
701 Brickell Avenue, Suite 3000
Miami, FL 33131

*Counsel for Individual Defendants Maurice R. Ferré, Fritz L. LaPorte, Christopher C. Dewey, S. Morry Blumenfeld, Charles W. Federico, Frederic H. Moll, William D. Pruitt, John G. Freund, John J. Savarese, and Richard R. Pettingill*

Lewis F. Murphy (CM/ECF)
**SQUIRE SANDERS**
200 South Biscayne Blvd, Suite 4100
Miami, FL  33131

*Counsel for Nominal Defendant MAKO Surgical Corp.*

R. Timothy Vannatta (CM/ECF)
**R. TIMOTHY VANNATTA, ESQ., P.A.**
P.O. Box 551660
Ft. Lauderdale, FL 33355

*Counsel for Plaintiff Robert Bardagy*